[No. D028156. Fourth Dist., Div. One. Feb. 5, 1999.]

SOUTH BAY CREDITORS TRUST et al., Plaintiffs and Appellants, v. GENERAL MOTORS ACCEPTANCE CORPORATION et al., Defendants and Respondents.

1070

**COUNSEL**

James J. Warner; John Y. Tremblatt; Gregory A. Lutz; and Jenniffer B. Appel for Plaintiffs and Appellants.

Arter & Hadden and Jacqueline I. Valenzuela for Defendants and Respondents Michael Farguson, Farguson Chevrolet, Inc., and Santa Clarita Motors, Inc.

O'Melveny & Myers, Wallace M. Allan and Gregory R. Oxford for Defendants and Respondents General Motors Acceptance Corporation and General Motors Corporation.

## OPINION

**REED, J.**[*]—South Bay Chevrolet, Inc. (a motor vehicle dealership), its officers and shareholders David Ordway and Travis Reneau, and South Bay Creditors Trust[1] sued General Motors Corporation (GM) and General Motors Acceptance Corporation (GMAC) for engaging in a course of allegedly wrongful conduct designed to cause South Bay's business to fail and force South Bay to sell the dealership to defendant Michael Farguson.[2] The Farguson and GM defendants filed general demurrers to the complaint on the ground South Bay failed to exhaust its administrative remedies before the New Motor Vehicle Board (the Board). The court sustained the demurrers without leave to amend on that ground and, alternatively, referred the matter to the Board under the doctrine of primary jurisdiction. South Bay appeals these rulings, contending the court erred in applying the doctrine of exhaustion of administrative remedies and the doctrine of primary jurisdiction. We reverse the judgment of dismissal and direct the court to vacate its order referring the matter to the Board.

### FACTUAL AND PROCEDURAL BACKGROUND

■ Because this is an appeal of a judgment of dismissal entered after the sustaining of a general demurrer, "we accept as true all the material allegations of the complaint." (*Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054, 20 A.L.R.5th 1016].) South Bay's complaint alleges the following facts.

South Bay was founded in 1946 and was one of the most successful and profitable automobile dealerships in Southern California before the occurrence of the wrongdoing giving rise to this action. Between 1981, when Ordway became involved in the business, and 1995, South Bay's business and profits consistently grew and it was one of the top three Chevrolet dealerships in San Diego County.

South Bay's profitability was largely dependent upon the financial support of GM and GMAC. GMAC provided South Bay with revolving lines of credit, known as "floor planning," and working capital loans to purchase

---

[*]Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]The complaint alleges plaintiff South Bay Creditors Trust is a California trust acting as assignee for the benefit of the creditors of South Bay Chevrolet. We will refer to the plaintiffs collectively and in the singular as South Bay.

[2]South Bay also named as defendants Farguson Chevrolet, Inc., and Santa Clarita Motors, Inc., corporations of which Farguson allegedly is president and a stockholder.

vehicles and fund its daily operations. The loans from GMAC were secured by South Bay's assets and the vehicles it purchased from GM. South Bay's operations were also funded in part by profits from its sale of conditional sales contracts to various lenders, including GMAC. South Bay profited by the difference between the interest rate a customer paid to the lender to finance a vehicle purchased from South Bay, called the "write rate," and the interest rate the lender charged to South Bay, called the "buy rate." The difference between the write rate and buy rate averaged between 2 percent and 3 percent of the amount the customer financed and was paid by the lender directly to South Bay. South Bay would shop its conditional sales contracts around the finance community to find the buy rate that would yield the greatest profit.

Before 1995 and in accordance with long-standing custom and practice, GM and GMAC granted South Bay certain privileges that helped it to operate successfully. Specifically, GM and GMAC allowed South Bay to: (1) "float" (i.e., delay making) payments to GM or GMAC[3] on new vehicles for between six and eight days, enabling South Bay to use those funds during the float period for operating expenses;[4] (2) purchase parts for its service department on credit to avoid the "cash crunches" caused by payment on a collect on delivery basis; (3) shop its conditional sales contracts to different lenders to maximize profits from their sale; (4) trade vehicles covered by its security agreement with GM and GMAC to other Chevrolet dealers without the traded vehicles being subject to payoffs; (5) use vehicles "floored" as "demos" or demonstrators by South Bay employees or prospective customers; and (6) "floor" its inventory of used vehicles to create additional funds for operating expenses.

In 1992 GM informed South Bay that all GM dealerships in Southern California would be required to relocate to an "autopark" or "automall" within three years or they would be forced out of business. GM approved a new autopark site for South Bay's dealership and told South Bay it was a valued dealer who would be rewarded for its loyalty with special privileges, financial support, advertising and an increased allotment of "hot vehicles" (i.e., vehicles in high demand) such as Blazers, Suburbans, and Camaros.

Ordway expressed apprehension about South Bay's move from its long-established and profitable location to the new, larger, more expensive and riskier autopark facility. GMAC advised Ordway that a marketing study

---

[3]The complaint is inconsistent as to whether the floated funds were owed to GM or GMAC.

[4]South Bay was contractually obligated to pay GM for a new vehicle immediately upon receiving its payoff on the vehicle.

conducted by corporate headquarters reflected extremely optimistic projections of sales of GM vehicles at the new site. To further induce South Bay to move to the new autopark, GM and GMAC reiterated their commitment to continue granting the various privileges enumerated above. Based on the mandate to move, GM and GMAC's representations and assurances, and South Bay's long-standing business relationship with and trust in GM and GMAC, South Bay agreed to move to the new autopark as its first dealer.

South Bay moved into the autopark in October 1994. As expected, its operating expenses increased as a result of the move and in January 1995 it experienced a "cash crunch." Consequently, Ordway met with Dan Albee, GMAC's branch manager, to request a working capital loan from GMAC to cover South Bay's increased cash needs. The morning following that meeting, GMAC sent a team of its agents to South Bay to conduct a "flooring check" or inventory of vehicles covered by South Bay's security agreement with GMAC. The flooring check revealed that South Bay was using about $335,000 in funds that were due to GMAC. Contrary to its custom of allowing a six- to eight-day float of such funds, GMAC, through Albee, demanded immediate payment of the $335,000. After Ordway reminded Albee of the parties' long-standing course of dealing and the assurances and inducements that persuaded South Bay to move, Albee gave South Bay four days to make its past due payments. However, at a meeting a couple of days later, Albee again demanded all moneys due to GMAC from the sale of vehicles under the flooring and security agreements, effectively canceling South Bay's six- to eight-day float. At that time South Bay still owed GMAC floated funds of about $95,000.

A few days later, on January 25, 1995, Albee threatened Ordway with arrest and imprisonment unless the $95,000 was paid immediately. He also told Ordway that the first dealer in a new autopark always fails. When Ordway asked why GM and GMAC had not disclosed that fact before South Bay moved, Albee told him that GMAC never explained the risks inherent in moving a dealership such as South Bay to a new autopark because if it did, no dealer would ever move.

South Bay's relationship with GM and GMAC further deteriorated between January 25 and February 15. In addition to canceling South Bay's six- to eight-day float, GM and GMAC placed a "keeper" on South Bay's premises, canceled all dealership trades between South Bay and other GM dealers, placed South Bay's parts department on a collect on delivery only status, prohibited South Bay from selling its conditional sales contracts to any lender other than GMAC, and converted sales tax revenues and Department of Motor Vehicles fees to their own use.

Between February and July, GM and GMAC carried out a plan to destroy South Bay and replace it with a dealer of their choice. They suspended their flooring agreement with South Bay and diverted at least 20 new vehicles that had been earmarked for South Bay and were critical to South Bay's survival to a rival Chevrolet dealer in San Diego County. As a result of GM and GMAC's conduct, Ordway and Reneau ultimately were forced to attempt to sell the dealership to avoid filing for bankruptcy to protect what remained of the business.

GM and GMAC unreasonably withheld approval of various prospective buyers chosen by Ordway and Reneau. GM and GMAC refused to approve one such prospective buyer unless Ordway and Reneau signed an agreement not to sue GM and GMAC. GM and GMAC also threatened to terminate all financial support and force South Bay into bankruptcy if Ordway and Reneau did not sign the agreement. Although the agreement not to sue contained false and objectionable recitals, Ordway and Reneau signed it under duress. GM and GMAC then breached the agreement by refusing to approve that sale and withholding financial support necessary for South Bay's survival.

After refusing several other dealers who would have purchased South Bay on terms favorable to Ordway and Reneau, GM and GMAC approved Farguson, the buyer of their choice. GM and GMAC dictated the terms of the sale, which were extremely favorable to Farguson and detrimental to Ordway and Reneau. GM and GMAC induced Farguson to join in their scheme to drive Ordway and Reneau out of business and replace them with Farguson by promising Farguson, among other things, a rent reduction of more than $20,000 for the new facility and the privileges they had granted South Bay before its move to the autopark, including six- to eight-day floats on moneys due GM or GMAC, more hot vehicles than the normal allotment to other GM dealers, and the ability to buy parts for the service department on credit.

South Bay filed the instant action against GM and GMAC, and also named Farguson, Farguson Chevrolet, Inc., and Santa Clarita Motors, Inc. (collectively Farguson) as defendants, pleading causes of action for fraud (intentional misrepresentation), constructive fraud/breach of fiduciary duty, breach of contract and breach of the implied covenant of good faith and fair dealing against GM and GMAC only, and causes of action for intentional interference with prospective economic advantage and negligence against GM, GMAC, and Farguson. GM and GMAC filed a general demurrer to the complaint on the ground South Bay failed to exhaust its administrative

remedies before the Board under Vehicle Code[5] section 3050, subdivision (c). Farguson filed a separate demurrer on the same ground.

The court issued a telephonic ruling sustaining the demurrers without leave to amend. After oral argument, the court modified its ruling on the demurrers by adding the following language: "Although the court finds that the weight of California case law supports its analysis under an exhaustion of remedies theory, the result remains unchanged under a primary jurisdiction analysis. Under the primary jurisdiction doctrine, the Court has weighed the factors discussed in [*Miller v. Superior Court* (1996) 50 Cal.App.4th 1665 [58 Cal.Rptr.2d 584]] and specifically exercises its discretion to refer this matter to the Board, finding that the expertise of that agency will be helpful to the Court."

DISCUSSION

I

*Exhaustion of Administrative Remedies*

■ Relying on *Miller* v. *Superior Court* (1996) 50 Cal.App.4th 1665 [58 Cal.Rptr.2d 584] and subsequent cases, South Bay contends it was not required to exhaust administrative remedies with the Board before bringing the instant action.[6]

Prior to *Miller*, "a solid phalanx of Court of Appeal decisions . . . held that *all* disputes between new car dealers and manufacturers must be litigated first with the [Board], not in state court. [Citations.]" (*Miller* v. *Superior Court, supra,* 50 Cal.App.4th at p. 1668, fn. omitted; see *Ray*

---

[5]All further statutory references are to the Vehicle Code.

[6]Section 3050 sets forth the general duties and authority of the Board. Section 3050, subdivision (c) provides, in relevant part, that the Board shall "[c]onsider any matter concerning the activities or practices of any person . . . holding a license as a new motor vehicle dealer, manufacturer, manufacturer branch, distributor, distributor branch, or representative pursuant to Chapter 4 (commencing with Section 11700) of Division 5 submitted by any person. A member of the board who is a new motor vehicle dealer may not participate in, hear, comment, advise other members upon, or decide any matter considered by the board pursuant to this subdivision that involves a dispute between a franchisee and franchisor. After that consideration, the board may do any one or any combination of the following:

"(1) Direct the department to conduct investigation of matters that the board deems reasonable, and make a written report on the results of the investigation to the board within the time specified by the board.

"(2) Undertake to mediate, arbitrate, or otherwise resolve any honest difference of opinion or viewpoint existing between any member of the public and any new motor vehicle dealer, manufacturer, manufacturer branch, distributor branch, or representative."

*Fladeboe Lincoln-Mercury, Inc.* v. *New Motor Vehicle Bd.* (1992) 10 Cal.App.4th 51, 54-55 [12 Cal.Rptr.2d 598].) *Miller* parted company with those cases.

*Miller* cited *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 80-81 [276 Cal.Rptr. 130, 801 P.2d 373], for the proposition that "exhaustion of administrative remedies is only required when the Legislature intends an agency to occupy a certain field *exclusively.* [Citation.] 'The general rule is that statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject.' [Citation.] By this token, 'where a statutory remedy is provided for a preexisting common law right, the newer remedy is generally considered to be cumulative, and the older remedy may be pursued at the plaintiff's election.' [Citation.] That is, no exhaustion is required." (*Miller* v. *Superior Court, supra,* 50 Cal.App.4th at pp. 1672-1673.)

Accordingly, *Miller* reasoned that whether a dealer's common law claims against a manufacturer had to be litigated first with the Board "rests on whether . . . the Board[] was established by the Legislature to adjudicate *all* disputes between new car dealers and manufacturers, or whether the Legislature had . . . a . . . more modest role in mind." (*Miller* v. *Superior Court, supra,* 50 Cal.App.4th at p. 1674.)[7] *Miller* concluded: "The Board is not the exclusive forum for disputes between dealers and manufacturers. The Legislature established the Board to prevent 'undue control' of new car dealers by manufacturers [citation], not to give manufacturers an extra line of defense from lawsuits by dealers. Indeed, given *Rojo*, we must respectfully part company from the Court of Appeal decisions which have held that the doctrine of exhaustion necessarily precludes new car or motorcycle dealers from suing a manufacturer for common law claims until they first present those claims to the Board. There simply is insufficient indicia from the Legislature that it intended the Board to occupy the field exclusively." (*Id.* at p. 1676.)

*Hardin Oldsmobile* v. *New Motor Vehicle Bd.* (1997) 52 Cal.App.4th 585 [60 Cal.Rptr.2d 583], also disagreed with the cases holding that dealers must

---

[7]The Legislature created a predecessor to the current Board in 1967 through the enactment of sections 3000 and 3050. The former board, known as the New Car Dealers Policy and Appeals Board, "was 'originally empowered to handle licensing of new automobile retail dealerships and to review decisions of the Department of Motor Vehicles disciplining dealers.' [Citation.]" (*Tovas* v. *American Honda Motor Co.* (1997) 57 Cal.App.4th 506, 512 [67 Cal.Rptr.2d 145].) "In 1973 . . . section 3000 et seq. was amended to create the [New Motor Vehicle Board]. One of the purposes behind the amendment was to assist independent new car and motorcycle dealers by preventing 'undue control' by vehicle manufacturers. [Citation.]" (*Miller* v. *Superior Court, supra,* 50 Cal.App.4th at p. 1668, fn. 2.)

present common law claims against manufacturers to the Board before asserting them in a court action. *Hardin* stated that the leading case of that line, *Yamaha Motor Corp.* v. *Superior Court* (1986) 185 Cal.App.3d 1232 [230 Cal.Rptr. 382],[8] "failed to recognize that the jurisdiction of the Board and the application of the exhaustion of remedies or primary jurisdiction doctrine must be considered separately. That a litigant must exhaust *administrative remedies* before seeking relief in the courts does not bestow upon the administrative agency the jurisdiction to consider and resolve *all common law and statutory remedies*. Prior resort to the administrative agency does not take away from the litigant the right to allege and prove claims not under the jurisdiction of the agency and does not expand the jurisdiction of the agency to hear and consider those claims." (*Hardin Oldsmobile* v. *New Motor Vehicle Bd., supra,* 52 Cal.App.4th at p. 593.)

The plaintiff dealer in *Hardin* alleged it had not received rightful allocations of the most saleable cars or been properly considered for new dealerships because it had refused to give Honda executives bribes and kickbacks in exchange for favored treatment in those areas. In addition to asserting various federal and state statutory violations, the dealer (Hardin) asserted five common law tort and contract claims and sought compensatory, treble, and punitive damages. (*Hardin Oldsmobile* v. *New Motor Vehicle Bd., supra,* 52 Cal.App.4th at pp. 587-588.) *Hardin* noted ". . . there is no statutory authority for the Board to award damages. This omission from the Vehicle Code, which we can only presume is intentional, is overlooked by the divisions and districts of the Court of Appeal that grant great leeway to the Board. Yet it is perhaps most indicative of legislative intent not to erode the courts' judicial power by giving the Board authority over statutory and common law causes of action not specifically included in the Vehicle Code. The Yamaha cases made no mention of the judicial powers clause of the California Constitution and made no attempt to determine what remedy the plaintiffs could obtain by resorting to the Board." (*Id.* at p. 595.)

*Hardin* recognized that administrative agencies generally have the authority to grant equitable and restitutionary relief incidental to licensee discipline. (*Hardin Oldsmobile* v. *New Motor Vehicle Bd., supra,* 52 Cal.App.4th at pp. 595-596.) *Hardin* noted, however, that the plaintiff dealer in that case did not seek equitable or restitutive relief. The dealer sought compensatory,

---

[8]*Yamaha Motor Corp.* v. *Superior Court* (1987) 195 Cal.App.3d 652 [240 Cal.Rptr. 806], another case involving a dispute between Yamaha and one of its franchisees, followed the earlier *Yamaha* case in concluding the franchisee failed to exhaust its administrative remedies and therefore could not maintain a civil action because its common law claims overlapped with allegations made in protests it had filed with the Board. (*Yamaha, supra,* 195 Cal.App.3d at pp. 654-660.)

treble, and punitive damages, which are "judicial remedies having little, if anything, to do with licensee discipline." (*Id.* at p. 597.) *Hardin* reasoned that if the Board were permitted to award such damages, ". . . the primary focus of the litigation would be the recovery of damages and the regulatory purpose would be incidental, if existent at all. Neither the statute defining the duties of the Board nor the judicial powers clause of the Constitution allows such a broadening of the Board's role. [Citation.]" (*Ibid.*)

*Hardin* concluded "[t]he Board's jurisdiction is 'specific' and 'limited,' not general. [Citation.] It may not assert jurisdiction beyond the bounds of its statutory authorization . . . . The status of the litigants—a new motor vehicle and a vehicle manufacturer—does not confer jurisdiction on the Board over common law claims and statutory claims not specifically committed to it." (*Hardin Oldsmobile* v. *New Motor Vehicle Bd., supra,* 52 Cal.App.4th at pp. 597-598.)

A 1997 amendment to section 3050, operative January 1, 1998, reflects the Legislature's disapproval of the *Yamaha* cases and confirms that *Miller* and *Hardin* correctly rejected the proposition that the Board has plenary authority over common law claims by motor vehicle dealers against manufacturers. The amendment added the following language to section 3050 as subdivision (e): "Notwithstanding subdivisions (c) and (d), the courts have jurisdiction over all common law and statutory claims originally cognizable in the courts. For those claims, a party may initiate an action directly in any court of competent jurisdiction."

The 1997 amendment to section 3050 was enacted by the passage of Senate Bill No. 690 (Senate Bill 690). ██ In determining the legislative intent underlying the passage of a bill, courts may consider the motive or understanding of the author of the bill or other individual legislator if that "legislator's opinions regarding the purpose or meaning of the legislation were expressed in testimony or argument to either a house of the Legislature or one of its committees, . . ." (*McDowell* v. *Watson* (1997) 59 Cal.App.4th 1155, 1161, fn. 3 [69 Cal.Rptr.2d 692].)

██ In its analysis of Senate Bill 690, the Senate Judiciary Committee noted: "The sponsor [of the bill] contends that it *was never intended that the Board be the exclusive arbiter of all disputes,* and that common law claims of consumers and new car dealers should be able to be brought directly in court without having to complete the administrative process. For example, the sponsor asserts, manufacturers have been able to divert breach of contract actions, fraud actions, unfair deceptive practices actions, and tort actions into

the Board's jurisdiction under the exhaustion doctrine." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 690 (1997-1998 Reg. Sess.) as amended Apr. 14, 1997, com., par. 2(b), italics added.) The Assembly Judiciary Committee stated: "SB 690 clarifies the jurisdiction of the [Board]. Specifically, *this bill*: [¶] . . . Clarifies that *the courts*, not the Board, have primary jurisdiction over all common law and statutory claims originally cognizable in the courts." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 690 (1997-1998 Reg. Sess.) as amended June 24, 1997, summary par. 1., italics added in place of underscoring in original.)[9]

These committee reports show that the 1997 amendment to section 3050 was a clarification of the law regarding the Board's jurisdiction rather than a change in the law. It is well settled that " '. . . the enactment of a statute or an amendment to a statute for the purpose of clarifying preexisting law or making express the original legislative intent is not considered a change in the law; . . . it simply states the law as it was all the time, and no question of retroactive application is involved.' [Citation.]" (*Re-Open Rambla, Inc.* v. *Board of Supervisors* (1995) 39 Cal.App.4th 1499, 1511 [46 Cal.Rptr.2d 822].) The 1997 amendment to section 3050 makes it clear that South Bay's action consisting entirely of common law claims against the various defendants was properly initiated in superior court. The Legislature never intended the Board to be the exclusive arbiter of all disputes between new motor vehicle dealers and manufacturers. Accordingly, the court erred in dismissing South Bay's complaint on the ground South Bay failed to exhaust its administrative remedies.

II

*Primary Jurisdiction*

The defendants contend that even if the court erred in dismissing the complaint based on South Bay's failure to exhaust administrative remedies, it properly referred the matter to the Board under the doctrine of primary jurisdiction.

In *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487, 826 P.2d 730], the California Supreme Court explained the difference between the doctrines of primary jurisdiction and exhaustion of administrative remedies: " ' "*Exhaustion" applies where a claim is cognizable*

---

[9]South Bay requested that we take judicial notice of the Senate Judiciary Committee report; GM and GMAC requested judicial notice of the Assembly Committee on the Judiciary report. We granted both requests.

*in the first instance by an administrative agency alone*: judicial interference is withheld until the administrative process has run its course. *"Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts,* and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' [Citation.]" (*Id.* at pp. 390-391.) Preliminary resort to the administrative body is necessary when " '. . . the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the [administrative body].' " (*Id.* at p. 387.)

■ The doctrine of primary jurisdiction "advances two . . . policies: it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws. [Citations.] [¶] No rigid formula exists for applying the primary jurisdiction doctrine [citation]. Instead, resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case. [Citations.] This discretionary approach leaves courts with considerable flexibility to avoid application of the doctrine in appropriate situations, as required by the interests of justice." (*Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th at p. 391, fns. omitted.) In determining whether the interests of justice militate against application of the doctrine in a particular case, courts should consider the adequacy of the available administrative remedies and the expense and delay to litigants. (*Id.* at pp. 391-392, fn. 9.)

■ Here, the court's referral of the case to the Board under the doctrine of primary jurisdiction was inappropriate for two reasons. First, it was inconsistent with its dismissal of the action. The proper procedure in applying the doctrine of primary jurisdiction is not to dismiss the action but to stay it pending resolution of the issues within the administrative body's expertise. (*Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th at p. 401.) Following oral argument on defendants' demurrers, the court referred the case to the Board under the primary jurisdiction doctrine *in addition to* confirming its telephonic ruling sustaining defendants' demurrers without leave to amend. Because the referral to the Board required a stay rather than dismissal of the action, the referral was rendered ineffective by the court's simultaneous sustaining of defendants' demurrers and nunc pro tunc judgment of dismissal.

Second, referral to the Board under the primary jurisdiction doctrine was inappropriate because the factual issues and common law claims raised by

South Bay's complaint are not beyond the usual competence of the courts. The complaint does not indicate a need for prior resort to the Board's administrative expertise to enhance the court's decisionmaking or assure uniform application of regulatory laws. As *Hardin* noted, the Board's jurisdiction is specific and limited by statute to certain types of claims; it does not extend to common law claims not specifically committed to the Board. (*Hardin Oldsmobile* v. *New Motor Vehicle Bd., supra,* 52 Cal.App.4th at pp. 597-598.)

In *Miller,* the Court of Appeal directed the trial court to consider whether claims for fraud and unfair business practices against the defendant manufacturer should be referred to the Board under the doctrine of primary jurisdiction. (*Miller* v. *Superior Court, supra,* 50 Cal.App.4th at pp. 1677-1678.) However, in *Kemp* v. *Nissan Motor Corp.* (1997) 57 Cal.App.4th 1527, 1532 [67 Cal.Rptr.2d 794], the same appellate court concluded that in light of *Hardin,* ". . . it is now clear that there was no possibility of proper application of the primary jurisdiction doctrine in *Miller* because the doctrine cannot apply in cases where the administrative agency has no jurisdiction."

*Kemp* involved an action for breach of contract by a dealer (Kemp) against a manufacturer based on the manufacturer's refusal to approve the dealer's sale of the dealership to a third party. Clarifying its application of the primary jurisdiction doctrine in *Miller, Kemp* stated: "To the degree that *Miller* might be (erroneously) read for the proposition that common law claims of new car dealers against manufacturers can be first referred to the board under the doctrine of primary jurisdiction, the present case affords us a chance to make amends. Just because a claim may come within the board's jurisdiction does not mean that it is one appropriate for prior resort to administrative process under the primary jurisdiction doctrine. Here, for example, while it is possible that the very act of referring Kemp's claim to the board would create the jurisdiction necessary for the board to hear it, the claim is still not an appropriate one for application of the primary jurisdiction doctrine.

"The doctrine of primary jurisdiction is based on the ideas of judicial economy and the need for uniformity in the application of administrative regulations. [Citation.] The agency review should be able to resolve complex factual questions and afford a record for subsequent judicial review. [Citation.] For example, questions of insurance ratemaking are tailor-made for the doctrine [citation], as are questions of railroad shipping rates under the Interstate Commerce Commission [citation]." (*Kemp* v. *Nissan Motor Corp., supra,* 57 Cal.App.4th at pp. 1532-1533, fn. omitted.)

*Kemp* noted the defendant manufacturer had not pointed to any set of regulations needing uniform interpretation or shown "how board involvement might resolve any factual issues, or how it might provide a record for subsequent judicial review. All that would be accomplished would be delay of a plaintiff's right to a jury trial. [Citation.]" (*Kemp* v. *Nissan Motor Corp., supra,* 57 Cal.App.4th at p. 1533.) *Kemp* concluded that "[u]nder such circumstances, it would be error for us to even suggest that application of the doctrine of primary jurisdiction and prior resort to administrative process is a possibility." (*Ibid.*)

Prior resort to the Board is similarly inappropriate in the present case. South Bay's common law tort and contract claims do not fall within the Board's specific and limited statutory jurisdiction, but rather are "'. . . within the conventional competence of the courts . . . .'" (*Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th at p. 390.) This case does not involve a set of regulations needing uniform interpretation and defendants have not shown a compelling need to take advantage of the Board's administrative expertise to resolve the issues raised by South Bay's complaint. Although the Board's expertise undoubtedly extends to industry standards and customs regarding new vehicle allocation, floor planning, and manufacturer-dealer financing arrangements, to the extent such matters are relevant to the issues in this case they can be readily addressed through percipient and expert witnesses at trial.

In considering whether to refer claims by dealers against manufacturers to the Board under the primary jurisdiction doctrine, courts should carefully consider the expense of Board proceedings to the dealer, the extent to which a referral would delay rather than expedite resolution of the case, and the adequacy of Board remedies for the claims at issue. Courts should exercise great caution to prevent the Board from being used by manufacturers as "an extra line of defense from lawsuits by dealers" rather than fulfilling its intended purpose of protecting dealers from "'undue control' . . . by manufacturers." (*Miller* v. *Superior Court, supra,* 50 Cal.App.4th at p. 1676.) Here, as in *Kemp,* prior resort to the Board would only delay the plaintiffs' right to a jury trial at needless cost to all parties. We conclude the court abused its discretion in referring the case to the Board under the doctrine of primary jurisdiction.[10]

---

[10]We do not decide whether a court would ever have discretion to refer a dealer's common law claims against a manufacturer to the Board under the doctrine of primary jurisdiction, as that issue was not adequately briefed and its resolution is not essential to the disposition of this appeal.

## DISPOSITION

The judgment of dismissal is reversed. The court is directed to vacate its order sustaining defendants' demurrers without leave to amend and enter a new order overruling the demurrers. The court is also directed to vacate its order referring the case to the Board under the doctrine of primary jurisdiction. South Bay is awarded its costs on appeal.

Huffman, Acting P. J., and Haller, J., concurred.