[No. A083784. First Dist., Div. Five. Dec. 29, 1999.]

MILTON WISE et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Appellant.

**[Opinion certified for partial publication.¹]**

---

¹Pursuant to California Rules of Court, rules 976(b) and 976.1, part III of this opinion is not certified for publication.

**COUNSEL**

Popelka & Allard, Bernard J. Allard, Joseph H. Ainley and Jeffrey Lochner for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Steven P. Burke; Severson & Werson, Jan T. Chilton and William L. Stern for Defendant and Respondent.

**OPINION**

**HANING, J.**—Plaintiffs/appellants Milton Wise, Leroy Williams, Yvonne Williams and Gwen Wise, individually and on behalf of the general public, appeal the dismissal of their action against defendant/respondent Pacific Gas and Electric Company (PG&E) for unfair business practices (Bus. & Prof. Code, §§ 17200 et seq., 17500), violation of Public Utilities Code section 2106, and fraud, after PG&E's demurrer was sustained without leave to amend. Appellants contend the trial court erroneously ruled the action lies within the exclusive jurisdiction of the Public Utilities Commission (PUC).

BACKGROUND

■ A demurrer admits the truth of all material factual allegations, and we are required to accept them as such, together with those matters subject to judicial notice. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We report the facts accordingly.

PG&E is a regulated utility providing gas and electrical services to customers throughout approximately 60 percent of California, and requires PUC approval of its rates for electricity and natural gas.

In approximately January 1984 PG&E initiated a Gas Regulator Replacement Program (GRRP) to replace all its old regulators, which were corroding and/or did not contain an internal pressure relief valve (IRV). The lack of an IRV rendered the older regulators susceptible to overpressurization, which could result in spontaneous gas leaks. In 1986, during the course of a general rate case proceeding, PG&E represented to the PUC that approximately 2,000,000 regulators would be replaced, the GRRP would occur over a seven-year period between 1984 and 1990, and PG&E would actively categorize and designate all non-IRV regulators in residences and small businesses and replace them with IRV regulators. PG&E also represented to the PUC that the cost of the GRRP from 1987 to 1990 would be $18 million annually, and the estimated seven-year cost would exceed $101 million.

PG&E asked the PUC to allow a rate increase to reflect the costs already incurred as well as those to be incurred between 1987 and 1989 for the GRRP, representing that it would continue the GRRP and would replace approximately 260,000 regulators per year at an annual cost of $18 million. Based on PG&E's representations the PUC authorized an increased rate, and PG&E's customers paid a gas rate which included the cost PG&E represented it would incur in conducting the GRRP.

In approximately June 1988 PG&E unilaterally ceased actively initiating regulator replacements, and since that time has replaced non-IRV regulators only if some other service call justified its physical presence at a residence or business and required a shutoff of the main gas line leading to the premises. Under this new maintenance program only a nominal volume of old regulators would be replaced.

During subsequent rate proceedings, PG&E did not inform the PUC of the change in the GRRP, and that it was not incurring the costs it had previously represented it would incur. PG&E's internal documents suggest that PG&E's personnel were instructed not to disclose to the PUC that PG&E had

terminated its active GRRP unless specifically asked by PUC members, and its specific company policy was to withhold information from the PUC regarding termination of the GRRP.

As a result of its alleged surreptitious termination of the GRRP, PG&E charged appellants and the general public the sum of $42,240,000, for services it failed to provide.

Appellants also allege that since June 1988 PG&E has continued to charge its ratepayers $1.1 million annually for the cost of its ongoing maintenance program, despite the fact that as of 1990 it had already charged its ratepayers for replacement of every old regulator in its service area. Consequently, appellants allege, each annual charge for the ongoing maintenance program constitutes a double recovery by PG&E.

Appellants' first amended complaint alleges five causes of action: (1) violation of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.); (2) false advertising (Bus. & Prof. Code, § 17500) (collectively, the UCL claims); (3) violation of Public Utilities Code section 2106 by violating the UCL; (4) fraud and deceit—concealment; and (5) fraud—negligent misrepresentation. As to the UCL claims and related cause of action for violation of Public Utilities Code section 2106, appellants seek restitution and disgorgement of "any and all monies, including any profits" obtained by PG&E as a result of its "deceptive, unlawful and misleading business acts and practices, including its misrepresentations, misleading statements and acts of concealment" made to the PUC, and attorney fees (Code Civ. Proc., § 1021.5). In the common law fraud causes of action appellants seek compensatory and punitive damages.

PG&E demurred on the grounds the court lacks subject matter jurisdiction because exclusive jurisdiction resides with the PUC (Code Civ. Proc., § 430.10, subd. (a)), and that the complaint fails to state a cause of action because relief is barred by the filed rate doctrine. As to the fraud causes of action PG&E also argued that classwide reliance could not be proven, and appellants had failed to plead the elements of representation and reliance.

In opposition to the demurrer appellants argue that pursuant to *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 918-919 [55 Cal.Rptr.2d 724, 920 P.2d 669] (*Covalt*), the PUC does not have exclusive subject matter jurisdiction over the action because the action does not contravene an order of the PUC, and enforces rather than hinders PUC policy. They also argue that because their claims do not involve ratemaking, the reasonableness of rates and/or tariffs, and the uniform application of the

PUC's rates or regulatory statutes, the primary jurisdiction doctrine does not apply. In addition they argue that the Public Utilities Code does not bar a UCL action, the filed rate doctrine is inapposite to this case, and the complaint states prima facie claims for fraud and misrepresentation.

The court sustained the demurrer without leave to amend, and this appeal ensued.

## DISCUSSION

### I

Article VI, section 1 of the California Constitution vests the judicial power of this state in the courts. However, article XII establishes the PUC and gives it broad regulatory power over public utilities, "including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures." (*Covalt, supra,* 13 Cal.4th at p. 915, citing Cal. Const., art. XII, §§ 2, 4, 6; *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 6 [114 Cal.Rptr. 753; 523 P.2d 1161] (*Waters*).) The Constitution also gives the Legislature "[P]lenary power . . . to establish the manner and scope of review of [PUC] action in a court of record . . . ." (Cal. Const., art. XII, § 5; *Covalt, supra,* at p. 915.)

Pursuant to this constitutional scheme, the Legislature has enacted, inter alia, two statutes upon which the parties rely. In support of its position that the courts lack jurisdiction over appellants' action, PG&E relies primarily on Public Utilities Code[2] section 1759, which provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the [PUC] or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the [PUC] in the performance of its official duties, as provided by law and the rules of court."

Appellants rely on section 2106, which is the sole private remedy available against any regulated utility that violates any PUC order. (*Covalt, supra,* 13 Cal.4th at p. 916.) Section 2106 states: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the [PUC], shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was willful, it may, in

---

[2]All further undesignated section references are to the Public Utilities Code.

addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person."

In *Waters* the Supreme Court harmonized sections 1759 and 2106 by holding that judicial authority to award damages under section 2106 applies only in "those situations in which an award of damages would not hinder or frustrate the [PUC's] declared supervisory and regulatory policies." (*Waters, supra*, 12 Cal.3d at p. 4.) *Waters* was an action by a telephone customer for damages arising from the telephone company's failure to provide adequate service. The trial court limited plaintiff's damages to a credit allowance established by a PUC tariff schedule and the Supreme Court affirmed, noting that in limiting any recovery available for lack of service, the PUC was securing lower rates for the consumer, which was a proper regulatory function.

*Covalt* was an action by homeowners against a regulated electrical utility, alleging damages from electromagnetic field (EMF) radiation. The PUC had adopted a general policy concerning the potential effect of EMF's, and what action, if any, electrical utilities should take to minimize any potential risk. Affirming the Court of Appeal's directive that the electric company's demurrer be sustained without leave to amend, *Covalt* confirmed that pursuant to the *Waters* rule, "an action for damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the [PUC], i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the [PUC], i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Covalt, supra*, 13 Cal.4th at p. 918, fn. omitted.)

Explaining the *Waters* rule, *Covalt* noted: "When the bar raised against a private damages action has been a ruling of the [PUC] on a single matter such as its approval of a tariff or a merger, the courts have tended to hold that the action would not 'hinder' a 'policy' of the [PUC] within the meaning of *Waters* and hence may proceed. But when the relief sought would have interfered with a broad and continuing supervisory or regulatory program of the [PUC], the courts have found such a hindrance and barred the action under section 1759." (13 Cal.4th at pp. 918-919.)

By way of illustration, *Covalt* cited *Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224 [18 Cal.Rptr.2d 308] (*Cellular Plus*) and *Stepak v. American Tel. & Tel. Co.* (1986) 186 Cal.App.3d 633 [231 Cal.Rptr. 37]

(*Stepak*) as the type of case that can proceed to civil judgment under section 2106, and distinguished *Brian T. v. Pacific Bell* (1989) 210 Cal.App.3d 894 [258 Cal.Rptr. 707] (*Brian T.*) and *Schell v. Southern Cal. Edison Co.* (1988) 204 Cal.App.3d 1039 [251 Cal.Rptr. 667] (*Schell*) as typical of the category of cases preempted by section 1759. (*Covalt, supra,* 13 Cal.4th at pp. 919-923.)

*Brian T.* was an action by parents of minor children against a telephone company, challenging the method by which the telephone company blocked sexually explicit messages to minor children from commercial telephone services. *Schell* was an action against a gas and electric utility attacking the manner in which gas and electricity was metered. In both cases the involved utility was acting in conformance with established PUC regulations.

By contrast, *Cellular Plus* was an action under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) against two cellular telephone companies for price fixing. In overruling a judgment sustaining the companies' demurrers the Court of Appeal held that the price-fixing action did not impede the PUC's supervisory or regulatory policies, noting that, like the instant case, the plaintiffs were not challenging the PUC's ratemaking authority or seeking to change any rates the PUC had approved. *Stepak* was a class action by a minority shareholder of a telephone utility seeking to prevent a merger. Again, the Court of Appeal ruled that the action was authorized by section 2106, noting that the PUC had no policy on the subject of safeguarding minority investor interests.

PG&E contends the present action interferes with the PUC's ratemaking policy. However, appellants disclaim any challenge to the PUC's established rates. In essence, appellants contend PG&E failed to provide the services, i.e., the new valves, for which appellants were charged. PG&E does not cite, and the record does not contain any evidence of any existing regulation or policy of the PUC which might be impeded if appellants' action proceeds. The claim that PG&E charged for services it failed to deliver does not interfere, hamper, hinder, frustrate or otherwise impede any supervisory or regulatory PUC policy.

## II

█ PG&E contends the trial court properly invoked the primary jurisdiction doctrine to bar the action.

█ The primary jurisdiction doctrine " '*applies where a claim is originally cognizable in the courts,* and comes into play whenever enforcement of

the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390 [6 Cal.Rptr.2d 487, 826 P.2d 730] (*Farmers Ins. Exchange*), quoting *United States v. Western Pac. R. Co.* (1956) 352 U.S. 59, 63-64 [77 S.Ct. 161, 164-165, 1 L.Ed.2d 126].) The doctrine does not permanently foreclose judicial action, but provides the appropriate administrative agency with an opportunity to act if it chooses to do so. (*Shernoff v. Superior Court* (1975) 44 Cal.App.3d 406, 409 [118 Cal.Rptr. 680] (*Shernoff*).)

The primary jurisdiction doctrine advances two related policies: (1) it enhances judicial efficiency by permitting courts to take advantage of administrative expertise; and (2) it helps to assure uniform application of regulatory laws. (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 391.) Application of the doctrine lies within the court's discretion. (*Id.* at pp. 391-392.) In applying the primary jurisdiction doctrine the proper procedure is to stay the action pending resolution of the issues within the administrative body's expertise. (*Id.* at p. 401; *South Bay Creditors Trust v. General Motors Acceptance Corp.* (1999) 69 Cal.App.4th 1068, 1081 [82 Cal.Rptr.2d 1] (*South Bay Creditors Trust*); *Cellular Plus, supra,* 14 Cal.App.4th at p. 1249.)

Courts have frequently applied the primary jurisdiction doctrine and stayed actions where the issues raised in the trial court action were pending before an administrative agency. (See *Farmers Ins. Exchange, supra,* 2 Cal.4th at pp. 388-389, 401-402, citing *Nader v. Allegheny Airlines* (1976) 426 U.S. 290, 299, 302-304 [96 S.Ct. 1978, 48 L.Ed.2d 643] (*Nader*); *Nader v. Allegheny Airlines, Inc.* (D.C. Cir. 1975) 512 F.2d 527, 546, 552 [167 App.D.C. 350]; and *Tank Car Corp. v. Terminal Co.* (1940) 308 U.S. 422, 433 [60 S.Ct. 325, 331, 84 L.Ed. 361]; *Pacific Bell v. Superior Court* (1986) 187 Cal.App.3d 137, 139-141 [231 Cal.Rptr. 574] (*Sable Communications*); *Shernoff, supra,* 44 Cal.App.3d at pp. 408-409.) Administrative agency involvement may serve to resolve factual issues or provide a record for subsequent judicial review. (*South Bay Creditors Trust, supra,* 69 Cal.App.4th at p. 1083.) In addition, a stay will conserve judicial and other resources which otherwise would be consumed in litigation of issues that may be resolved by the administrative proceeding. (*Sable Communications, supra,* at p. 140.)

■ PG&E advances the primary jurisdiction doctrine based on the PUC's potential adoption of a policy or regulatory scheme concerning the GRRP. With no objection and pursuant to Evidence Code sections 452, subdivisions (c) and (h), and 459, PG&E requests that we judicially notice

the PUC decision in *Carey v. Pacific Gas & Electric Co.* (1998) Cal.P.U.C. Dec. No. 98-12-076 (*Carey*) and the testimony of a witness in the evidentiary hearing before the administrative law judge in the *Carey* PUC proceeding. In the trial court PG&E, without opposition, asked the court to judicially notice the *Carey* PUC complaint and its related joinder, but the record contains no express ruling on the request for judicial notice.

Evidence Code section 452, subdivision (c) (official acts) permits the Court of Appeal to take judicial notice of a PUC decision. Judicial notice of the PUC's *Carey* decision is appropriate here since that decision, which is relevant to the instant case, was filed after the trial court's ruling on the demurrer in this case. (*Vila v. Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469, 475, fn. 5 [43 Cal.Rptr. 654] (*Vila*); accord, *San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 552-553 [45 Cal.Rptr.2d 117].)

In November 1997 Joanne Carey filed a complaint against PG&E with the PUC after a fire and explosion destroyed a 15-unit apartment complex. In April 1998 several tenants filed a joinder in the *Carey* PUC complaint, in which they claimed that the incident was caused in part by PG&E's fraudulent termination of the GRRP, and requested that the PUC impose a fine against PG&E in an amount at least equal to the money it saved by suspending the GRRP.

The PUC's December 1998 decision in the *Carey* adjudicatory proceeding stated: "In the Scoping Memo[3] issued prior to the hearing, we ruled that the matter of fraudulent conduct . . . [was] outside the scope of the complaint proceeding and more appropriately decided in future proceedings, should staff at a later date recommend the institution of such proceedings. During the hearing, while we denied PG&E's motion to strike testimony of unethical conduct and misrepresentation to terminate the [GRRP], we admitted such testimony for the limited purpose of permitting the parties to complete the evidence of their position on the allowable issues and to develop a record on the need for a future investigation into these allegations. Such relevant evidence was allowed under the Assigned Commissioner Scoping Memo. [¶] Now that we have heard this evidence and admitted certain relevant documents, the staff will be able to review this and any other evidence to determine whether an investigation of these and further issues should be opened." The decision ordered the Consumer Services Division (CSD) to advise the PUC "if an order instituting an investigation is needed to determine whether [PG&E] engaged in fraudulent conduct to terminate its

---

[3]According to PG&E, a scoping memo in a PUC proceeding "serves roughly the same purpose as a pretrial conference order, defining the issues that will be contested in that proceeding."

[GRRP] and whether this program should be continued. . . . CSD will make any recommendations to the [PUC] regarding these matters under the normal procedures." This indicates that the PUC may be commencing the process of formulating a policy concerning the GRRP.

Our Supreme Court has stated that "[n]o rigid formula exists for applying the primary jurisdiction doctrine [citation]. Instead, resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case. [Citations.] This discretionary approach leaves courts with considerable flexibility to avoid application of the doctrine in appropriate situations, as required by the interests of justice." (*Farmers Ins. Exchange, supra*, 2 Cal.4th at pp. 391-392, fns. omitted.)

Appellants argue that their UCL and fraud claims are not subject to the primary jurisdiction doctrine. However, this contention was rejected by *Farmers Ins. Exchange* insofar as the UCL claims are concerned. (2 Cal.4th at pp. 392-395) As to the fraud claims, "[t]he doctrine of primary jurisdiction 'is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.' . . . Even when common-law rights and remedies survive and the agency in question lacks the power to confer immunity from common-law liability, it may be appropriate to refer specific issues to an agency for initial determination" to take advantage of administrative expertise or to assure uniform application of regulatory laws. "The doctrine has been applied, for example, when an action otherwise within the jurisdiction of the court raises a question of the validity of a rate or practice included in a tariff filed with an [administrative] agency . . . , particularly when the issue involves technical questions of fact" within the agency's expertise. (*Nader, supra*, 426 U.S. at pp. 303-304 [96 S.Ct. 1978, 1986, 1987].)

Generally, the standards to be applied in a common law fraud action are within the conventional competence of the courts and involve no technical questions of fact requiring agency expertise. (*Nader, supra*, 426 U.S. at pp. 305-306 [96 S.Ct. at pp. 1987-1988]; *Farmers Ins. Exchange, supra*, 2 Cal.4th at p. 390; *South Bay Creditors Trust, supra*, 69 Cal.App.4th at p. 1083; *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1112 [53 Cal.Rptr.2d 229], disapproved on other grounds in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 184-185 [83 Cal.Rptr.2d 548, 973 P.2d 527].) Instead, application of the primary jurisdiction doctrine in each individual case focuses on whether agency review will enhance "court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise," and/or help "assure uniform application of regulatory laws." (*Farmers Ins. Exchange, supra*, at p. 391.)

Appellants further contest the applicability of the primary jurisdiction doctrine on the ground that the PUC lacks subject matter jurisdiction over their claims and cannot provide them with a suitable remedy. This is not entirely correct. Although the PUC has no jurisdiction to award monetary damages for tortious conduct (*Vila, supra,* 233 Cal.App.2d at p. 479; *Mak v. PT&T Co.* (1971) 72 Cal.P.U.C. 735, 738), it does have authority to "do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient" in the supervision and regulation of California public utilities. (§ 701; see also *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905 [160 Cal.Rptr. 124, 603 P.2d 41] (*Consumers Lobby*).)

■ The PUC may exercise equitable jurisdiction as an incident to its express duties and authorities. Pursuant thereto, it may, for example, issue injunctions in aid of its jurisdiction, direct that a trust fund be created to conserve potential refunds during a stay of an order lowering rates, reform contracts of public utilities to make them conform to the public interest, and issue cease and desist orders. (*Consumers Lobby, supra,* 25 Cal.3d at p. 907, and cases cited therein.) Pursuant to its constitutional authority to award reparation, the PUC may order public utilities to make reparation to aggrieved ratepayers for rates that are unreasonable, excessive or discriminatory. (§ 734; Cal. Const., art. XII, § 4; see also *Consumers Lobby, supra,* at p. 907.) ■ However, the PUC may not order reparation on the ground of unreasonableness where the rate in question has by formal finding been declared reasonable. (§ 734; *Pacific Tel. & Tel. Co. v. Public Util. Com.* (1965) 62 Cal.2d 634, 650-655 [44 Cal.Rptr. 1, 401 P.2d 353]; see also *Southern Cal. Edison Co. v. Public Utilities Com.* (1978) 20 Cal.3d 813, 816 [144 Cal.Rptr. 905, 576 P.2d 945].) It is this prohibition of retroactive ratemaking upon which appellants rely in support of their claim that the PUC lacks jurisdiction to afford them any relief.

Appellants necessarily allege, by implication at least, that PG&E obtained an excessive and unreasonable tariff by defrauding the PUC, but claim the PUC is without jurisdiction to respond to the fraud. ■ In construing the rule against retroactive ratemaking (§ 734), we employ the fundamental rule of statutory construction that a statute "must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity." (*DeYoung v. City of San Diego* (1983) 147 Cal.App.3d 11, 17-18 [194 Cal.Rptr. 722], disapproved on other grounds in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 15 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) The rule against retroactive ratemaking is based on the presumption

that the rate which was formally declared reasonable was considered and set in accordance with proper procedure. It is inconceivable that the Legislature intended the PUC would be powerless to award reparations where a public utility obtained a tariff rate by fraudulent means. Any other interpretation would fly in the face of the maxims of jurisprudence that "[n]o one can take advantage of his own wrong" (Civ. Code, § 3517), and "[f]or every wrong there is a remedy" (Civ. Code, § 3523). "A court of equity does not allow one to take advantage of his own fraud and will refuse to lend its aid to assist in enforcing a fraudulent imposition upon government, public, or private individuals." (*Bowman v. Bowman* (1932) 125 Cal.App. 602, 612 [13 P.2d 1049].) Likewise, the PUC in the exercise of its equitable jurisdiction must be able to fashion a remedy in the event of fraud committed by a public utility during the ratemaking process. The exercise of such equitable power will provide a remedy for the wrong committed and hopefully, serve to deter such fraudulent conduct in the future.

As we have noted, the PUC is not an ordinary administrative agency, but a constitutional body with broad legislative and judicial powers. (*Covalt, supra,* 13 Cal.4th at pp. 914-915.) Any action the PUC might take in the *Carey* proceeding concerning the GRRP will determine whether this action can or should be entertained by the court. Consequently, we conclude the case is appropriate for application of the primary jurisdiction doctrine.

III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment is reversed and remanded with directions to stay judicial proceedings and retain the matter on the court's docket pending further PUC proceedings, and to monitor the progress of the PUC proceedings to ensure against unreasonable delay of appellants' action. (See *Farmers Ins. Exchange, supra,* 2 Cal.4th at pp. 401-402.) Costs to appellants.

Jones, P. J., and Stevens, J., concurred.

A petition for a rehearing was denied January 19, 2000, and the petition of appellant Pacific Gas and Electric Company for review by the Supreme Court was denied April 19, 2000. Chin J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote 1, *ante*, page 287.