Filed 1/14/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO et al., <br>      Petitioners, <br> v. <br> PUBLIC UTILITIES COMMISSION, <br>      Respondent; <br> WAYMO, LLC, <br>      Real Party in Interest. | A169262 <br><br> (PUC No. 23-11-053) |

This is an original writ of review proceeding filed by the City and County of San Francisco and the San Francisco County Transportation Authority (Petitioners) challenging a decision by the Public Utilities Commission to issue a phase I driverless autonomous vehicle (AV) deployment permit to Waymo, LLC for fared passenger service in San Francisco and parts of San Mateo County.  As we shall explain, this permitting action was taken in accordance with policies and procedures set forth in a prior decision of the Commission, issued after lengthy proceedings in which the Commission considered and addressed myriad policy and operational concerns, including safety concerns, about the licensing of "drivered" (meaning AVs with a driver present) and driverless AVs for hire. Petitioners participated in those proceedings and did not challenge the Commission's decision therein.

The crux of Petitioners' challenge to the instant permitting decision is that the Commission failed to follow the law and/or abused its discretion by assertedly disregarding significant public safety issues. However, the record discloses the Commission considered and responded to Petitioners' safety concerns. It further discloses that few of the incidents that Petitioners brought to the attention of the Commission involved Waymo driverless AVs, each was minor, and none involved injuries. Thus, contrary to Petitioners' claim, this is not a record from which a court could conclude no reasonable commissioner could have voted to approve issuance of a phase I driverless AV deployment permit to Waymo. By law, our review of Commission decisions is limited, and there is simply no basis on the record here to conclude the Commission acted outside the confines of its authority or abused its discretion in issuing the phase I driverless deployment permit.

## REGULATORY BACKGROUND

### *Department of Motor Vehicles Regulation of AVs*

The Legislature has charged the Department of Motor Vehicles (DMV) with regulating the use of AVs on California roadways. Thus, by statute, any manufacturer seeking to operate an AV on the public roads must apply to the DMV for approval to do so. (Veh. Code, § 38750, subd. (c).) Approval is contingent upon compliance with numerous statutory and regulatory requirements. It is statutorily required, for example, that an AV have a mechanism to engage and disengage the autonomous technology that is "easily accessible to the operator"; contain a system to safely alert the operator if an autonomous technology failure is detected and allow the operator to take control or bring the vehicle to a complete stop; meet all applicable federal and state safety standards; contain a mechanism to capture and store sensor data for at least 30 seconds before any collision;

2

have been tested on public roads and complied with applicable testing standards; and have $5 million in insurance coverage. (*Id.*, subd. (c)(1)–(3).)

It is also statutorily required that the DMV adopt regulations governing the approval process. As pertinent here, these regulations must "include any testing, equipment, and performance standards . . . that the [DMV] concludes are necessary to ensure the safe operation of autonomous vehicles on public roads, with or without the presence of a driver inside the vehicle." (Veh. Code, § 38750, subd. (d)(2).)

The DMV is also charged with adopting regulatory requirements it determines "are necessary to ensure the safe operation of autonomous vehicles on public roads." (Veh. Code, § 38750, subd. (d)(3).) These include, as pertinent here, regulations regarding the aggregate number of AV deployments on public roads; special AV registration and licensing requirements; and rules for revocation, suspension, or denial of any AV license or approval. (*Ibid*.) Public hearings must precede the adoption of any regulations applicable to driverless AVs. (*Id.*, subd. (d)(4).)

In response to its statutory mandate, the DMV has adopted extensive regulations governing the testing and deployment of AVs on public roads. (See Cal. Code Regs., tit. 13, §§ 227.00 et seq. & 228.00 et seq.) Under the regulations, an AV is defined, with certain delineated exceptions not applicable here, to mean "any vehicle equipped with technology that is a combination of both hardware and software that has the capability of performing the dynamic driving task without the active physical control or monitoring of a natural person." (*Id.*, § 228.02, subd. (b).) The " '[d]ynamic driving task' means all of the real-time functions required to operate a vehicle in on-road traffic, excluding selection of final and intermediate destinations, and including without limitation: object and event detection,

3

recognition, and classification; object and event response; maneuver planning; steering, turning, lane keeping, and lane changing, including providing the appropriate signal for the lane change or turn maneuver; and acceleration and deceleration." (*Id.*, § 227.02, subd. (g).)

Among the many specific regulatory requirements for approval to operate on public roadways, an AV manufacturer must describe the " 'Operational Design Domain' " of the AV, which defines and limits the vehicle's operations by geographic size, roadway type, speed range, and environmental conditions. (Cal. Code Regs., tit. 13, §§ 228.06, subd. (a)(1), 227.02, subd. (j).) The manufacturer must also identify commonly occurring or restricting conditions—such as fog, wet road surfaces, and construction zones—under which the AV is unable to operate reliably in autonomous mode and explain how the vehicle is designed to react when such conditions occur. (*Id.*, § 228.06, subd. (a)(2)–(3).) The manufacturer must additionally certify that the autonomous technology is designed to detect and respond to roadway situations in compliance with all Vehicle Code provisions. (*Id.*, subd. (a)(9).)

Any application for approval must also include an end user education plan. (Cal. Code Regs., tit. 13, § 228.06, subd. (c)(1).) It must further set forth information regarding the manufacturer's testing program in the relevant operational design domain, including total number of test miles driven, a description of testing methods, and an accounting of any collisions which analyzes their causes and discusses any remediation measures adopted to avoid such problems in the future. (*Id.*, subd. (c)(7).)

In addition, and of particular pertinence here, DMV regulations require a manufacturer seeking either a testing or deployment permit for a driverless AV to submit a law enforcement interaction plan and make it available to the law enforcement agencies and other first responders in the vicinity of the

4

operational design domain for the driverless AV.[1]  The plan must "instruct those agencies on how to interact with the vehicle in emergency and traffic enforcement situations."  (Cal. Code Regs., tit. 13, § 227.38, subd. (e); see *id.*, § 228.06, subd. (c)(3).)  At a minimum, the plan must include: (1) how to communicate with the remote operator at all times when the vehicle is in operation; (2) where in the vehicle to find owner, registration, and insurance information in the event of a collision or traffic violation; (3) how to safely remove the vehicle from the roadway; (4) how to recognize when the vehicle is in autonomous mode and, if possible, safely disengage it; (5) how to ensure that the autonomous mode has been deactivated; (6) how to safely interact with electric and hybrid vehicles; (7) a description of the operational design domain of the vehicle; and (8) "[a]ny additional information the manufacturer deems necessary regarding hazardous conditions or public safety risks associated with the operation of the autonomous vehicle."  (*Id.*, § 227.38, subd. (e).)

A manufacturer must also certify that the vehicle possesses "[a] communication link between the vehicle and the remote operator, if any, to provide information on the vehicle's location and status and allow two-way communication between the remote operator and any passengers, if applicable, should the vehicle experience any failures that would endanger the safety of the vehicle's passengers or other road users while operating without a driver."  (Cal. Code Regs., tit. 13, § 228.06, subd. (b)(1).)

Even after approval is granted and a permit issued, the DMV has the authority to suspend or revoke it, including immediate suspension if it

---

[1]  " 'First responder' " in this context means law enforcement agencies, fire departments, and emergency medical personnel.  (Cal. Code Regs., tit. 13, § 227.38, subd. (e).)

determines the manufacturer's AV is not safe for operation on public roads. (Cal. Code Regs., tit. 13, § 228.20.)

### *The Commission's Regulatory Domain*

The Public Utility Commission's jurisdiction includes regulating transportation for hire pursuant to the Passenger Charter-party Carriers' Act (Pub. Util. Code,[2] § 5351 et seq.). The act's stated purposes are multi-fold: "[T]o preserve for the public full benefit and use of public highways consistent with the needs of commerce without unnecessary congestion or wear and tear upon the highways; to secure to the people adequate and dependable transportation by carriers operating upon the highways; to secure full and unrestricted flow of traffic by motor carriers over the highways which will adequately meet reasonable public demands by providing for the regulation of all transportation agencies with respect to accident indemnity so that adequate and dependable service by all necessary transportation agencies shall be maintained and the full use of the highways preserved to the public; and to promote carrier and public safety through its safety enforcement regulations." (§ 5352, subd. (a).)

To this end, the Commission licenses charter-party carriers of passengers (passenger carriers)—i.e., those "engaged in the transportation of persons by motor vehicle for compensation . . . over any public highway in this state." (§ 5360.) The Commission is not an administrative agency of the state but is a constitutionally created entity in its own right. (See generally *Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 300 (*Wise*).) As such, it promulgates its own rules and regulations governing the issuance of permits to passenger carriers and enforces those rules and regulations. (See

---

[2] All further undesignated statutory references are to the Public Utilities Code unless otherwise indicated.

6

§ 5381 ["the [C]omission may supervise and regulate every [passenger carrier] in the State and may do all things . . . necessary and convenient in the exercise of such power and jurisdiction"].)

With certain exceptions not relevant here, no passenger carrier may operate without first obtaining a permit from the Commission.  (§§ 5371, 5383, 5387, subd. (a).)  While permitted, each carrier must provide the Commission "annually with a list, prepared under oath, of all vehicles used in transportation for compensation during the preceding year" (§ 5384.2), and they must maintain trip reports with specified information for each passenger trip (§ 5381.5).  The Commission has full access at all times to a carrier's land, buildings, equipment, and records.  (§ 5389.)

Carriers must procure and maintain adequate liability and property damage insurance.  (§ 5391; see § 5433.)  And they may not unlawfully discriminate against any person, including people with disabilities.  (§§ 5440, subd. (c), 5440.5.)  The Commission also regulates how much passenger carriers can charge.  (§ 5401.)

An applicant for a permit to provide passenger service must (1) be financially and organizationally capable of conducting an operation that complies with the rules and regulations of the California Highway Patrol (CHP) governing highway safety; (2) be committed to observing state and federal hours of service regulations for all persons operating its vehicles; (3) have a preventative maintenance program in effect for its vehicles as mandated by the CHP; (4) participate in a program to regularly check the driving records of all persons operating its vehicles;[3] (5) have a safety

---

[3]  The DMV operates an employer "pull-notice system, which is a process for the purpose of providing the employer with a report showing the driver's current public record as recorded by the department, and any

7

education and training program in effect for all its vehicle operators; (6) maintain its vehicles in a safe operating condition and in compliance with the Vehicle Code and related regulations; (7) provide the Commission with proof of worker's compensation insurance coverage; and (8) provide for a mandatory controlled substance and alcohol testing certification program as adopted by the Commission. (§ 5374.) The Commission may also require procurement of a performance bond. (*Id.*, subd. (a)(3).)

## FACTUAL BACKGROUND

### *The Commission's AV Pilot Program*

In 2018, the Commission issued decision No. 18-05-043[4] establishing a pilot program for the regulation of AV passenger carriers—one part of which pertains to drivered AVs and the other to driverless AVs. In doing so, the Commission explained the DMV "regulates the safe operation of AVs," while the Commission "regulates passenger service provided by all common carriers." Thus, the program allows for "the introduction of AVs into passenger service to the public on a pilot basis, while providing for the safety and consumer protection of the passengers, consistent with the Commission's regulation of private passenger-carrying transportation entities subject to its jurisdiction." The program is expressly "designed to work in tandem with the

subsequent convictions, failures to appear, accidents, driver's license suspensions, driver's license revocations, or any other actions taken against the driving privilege or certificate, added to the driver's record while the employer's notification request remains valid and uncanceled." (Veh. Code, § 1808.1, subd. (b).) The Commission requires all transportation network companies, i.e., ride-sharing companies such as Uber and Lyft, to participate in this program. (§ 5444.) It also mandates that all such companies conduct criminal background checks on their drivers. (§ 5445.2.)

[4] *Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services* (June 6, 2018) Cal.P.U.C. Decision No. 18-05-043.

8

DMV's jurisdiction over regulations addressing the safe operation of AVs themselves by providing for the safety and consumer protections of passengers of commercial operators within the Commission's jurisdiction."

The pilot program for drivered AVs authorizes passenger carriers to add test AVs to their equipment list so long as operators are present in the vehicles at all times, carrier service is provided free of charge, and the carrier holds an AV tester program manufacturer's testing permit issued by the DMV and certifies compliance with all DMV regulations.[5]  The passenger carrier must also comply with all passenger carrier permit rules.  In addition, the test AV must have been permitted by the DMV for AV operation with a driver for a minimum of 30 days, with the carrier attesting to various operational data from that timeframe.

The pilot program for driverless AVs authorizes passenger carriers to operate free service if they hold a DMV manufacturer's testing permit for driverless vehicles and certify compliance with all DMV regulations.[6]  The carrier is required to comply with all passenger carrier permit rules, including enrolling all remote operators performing the dynamic driving task in the DMV's pull-notice system.  The AV must also have been permitted by the DMV for driverless AV operation for a minimum of 30 days, with the carrier attesting to various operational data from that timeframe. Additionally, passenger carriers operating under the driverless program must file with the Commission plans regarding (1) how the entity will notify passengers they are being offered driverless service and obtain their explicit

---

[5]  The regulations establishing the DMV's drivered AV testing program went into effect four years earlier, in 2014.

[6]  The regulations establishing the DMV's driverless AV testing program went into effect in April 2018.

consent; (2) how they will prevent their vehicles from providing driverless passenger service to, from, or within airports; (3) how they will limit driverless service to one chartering party at a time (i.e., no fare-splitting); and (4) how they will ensure that driverless service will only be available to adults 18 years of age or older. Carriers are further required to record all communications between vehicle passengers and remote operators and retain the recordings for at least one year. Finally, carriers must submit to the Commission their DMV-required plan setting forth the actions required in the event of a collision, as well as their DMV-required law enforcement interaction plan.

Further requirements for both the drivered and driverless pilot programs include (1) showing proof of compliance with DMV regulations addressing AV driver training and certification, including "ensuring that remote operators capable of performing the dynamic driving task comply with all terms and conditions applicable to drivers"; and (2) submitting all DMV-required collision reports and public versions of annual AV operations reports; submitting quarterly reports, including per-vehicle miles traveled during passenger service, total miles traveled during passenger service by electric vehicles, miles traveled per vehicle from the time the trip request was accepted to the pickup point, the amount of idling time between trips for each vehicle as a daily average and in monthly hours, number of passengers for each trip, and the total number of accessible rides that were fulfilled, declined, and/or unfulfilled due to lack of accessible vehicles.

Whether operating under the drivered or driverless provisions, an AV passenger carrier is immediately suspended if the carrier's DMV AV permit is suspended or revoked.

In its decision, the Commission found that establishing the pilot program was "an appropriate and reasonable exercise of [its] regulatory authority as [it sought] to balance public policy concerns, including the development of DMV regulations that allow driverless AVs to become part of California's vehicle fleet and traffic systems; the desire not to stifle innovation or artificially change the way technology develops; the need to maintain a level playing field; and the critical need to provide protections for the members of the public who choose to accept a ride."

Prior to the decision at issue here, the Commission issued seven permits under the drivered AV pilot program. As a result, the Commission received seven quarters of drivered AV data, which reflected over 600,000 autonomous miles driven. No permits had been issued under the driverless AV pilot program.

### The Commission's Deployment Decision

In October 2019, the Commission and the DMV held an all-party workshop to discuss the pilot program. It was attended by AV passenger carriers, trade groups, advocacy groups, and governmental agencies.

In December 2019, the administrative law judge assigned to the regulatory matter requested comments regarding the regulation of AVs and specifically addressing eight topics—the Commission's regulatory framework and next steps, including whether AVs should be deployed for fared passenger service; goals; data; definitions; permits; passenger safety; drivers; and vehicles. Written comments were submitted by various members of the

same stakeholder groups that had attended the workshop in October, including the San Francisco County Transportation Authority.[7]

The following year, in November 2020, the Commission issued decision No. 20-11-046[8] (the Deployment Decision), authorizing drivered and driverless AV services for hire in accordance with Commission rules (the Deployment Program). The stated goals of the Deployment Program are (1) protecting passenger safety; (2) expanding the benefits of AV technologies to all Californians, including those with disabilities; (3) improving transportation options, especially for disadvantaged and low-income communities; and (4) reducing greenhouse gas emissions and other pollutants.

The Deployment Decision established the procedure whereby passenger carriers can obtain authorization to operate under the Deployment Program. Carriers must apply for such authorization by submitting a "Tier-3 Advice Letter" in accordance with Commission general order (General Order) No. 96 B, which "provides a procedural vehicle by which an entity seeks a Commission order that the requested relief is consistent with Commission policy and applicable law."[9] They must supply proof that they meet

---

[7] The San Francisco County Transportation Authority is the county congestion management agency tasked with planning, monitoring, and funding public investments for San Francisco's comprehensive transportation system. Its governing board consists of the 11 members of the San Francisco Board of Supervisors, sitting as Transportation Authority board members.

[8] *Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services* (Nov. 23, 2020) Cal.P.U.C. Decision No. 20-11-046.

[9] Regulated entities receive Commission approvals in a variety of ways. What are considered formal proceedings can be initiated by an application, complaint, petition, order instituting investigation or

multitudinous requirements, including (1) holding and complying with the terms and conditions of their passenger carrier permit; (2) holding a DMV AV deployment permit and certifying compliance with all DMV regulations;[10] (3) maintaining insurance as required by the DMV; (4) enrolling all drivers (including remote operators) in the DMV pull-notice system; (5) attesting that one of its representative vehicles has been operating for a minimum of 30 days after receipt of the DMV AV deployment permit and providing detailed information on the specifics of that deployment; and (6) transmitting to the Commission all reports required by DMV regulations, including the carrier's process for responding to collisions, law enforcement interaction plan, collision reporting, disclosures to passengers regarding collection and use of

---

rulemaking, or order to show cause. (Cal.P.U.C. Gen. Order No. 96-B (May 10, 2018), gen. rule 3.7, p. 3.) An informal proceeding "refers to an advice letter or draft resolution submitted for disposition outside a formal proceeding." (*Ibid.*) An advice letter is an informal request "for Commission approval, authorization, or other relief, including an informal request for approval to furnish service" (*id.*, gen. rule 3.1, p. 2) submitted to the reviewing division assigned to the appropriate industry (*id.*, gen. rule 7.1, p. 10.) There are three tiers of advice letters. Tier 1 advice letters are generally effective pending disposition by staff and involve ministerial matters such as a tariff change in compliance with specific requirements of a statute or Commission order (*id.*, energy industry rule 5.1(1), p. 3) or a decrease in water rates (*id.*, water industry rule 7.3.1(5), p. 5). Tier 2 advice letters are generally effective after approval by staff and include straightforward matters such as a request for similar treatment (*id.*, water industry rule 7.3.2(7), p. 5) or a refund program in compliance with Commission order (*id.*, energy industry rule 5.2(3), p. 4). Tier 3 advice letters, in contrast, are subject to approval by the Commission after submission of a draft resolution by relevant industry staff. (*Id.*, energy industry rule 5.3, p. 4; *id.*, water industry rule 7.3.3, p. 6; *id.*, telecommunications industry rule 7.3, p. 7.)

[10] A carrier offering drivered or driverless AV passenger service for hire is immediately suspended from the Deployment Program upon suspension or revocation of its DMV permit.

personal information, and annual AV disengagement reports; (7) filing a plan regarding how the passenger carrier will provide notice to and seek consent for service from the passenger, including provision to the passenger of a photo of the vehicle that will be provided; (8) providing detailed quarterly operational reports for each trip, each month in the reporting period, and for the entire quarter; and (9) complying with all other applicable state and federal regulations.

Carriers seeking to provide driverless AV service must also submit a passenger safety plan describing their policies and procedures to minimize passenger risk, including: minimization of safety risks for all driverless passengers; minimization of safety risks for passengers sharing a ride; prevention and response to assaults or harassment; response to unsafe scenarios both inside and outside the vehicle; education and orientation of passengers with respect to the technology; safe entrance into, and exit from, the vehicle; accessibility; enabling passengers to contact the service provider during the trip and ensuring a timely and complete response; retention of all passenger comments and complaints; and a written COVID-19 emergency plan. A driverless participant must record all communications between passengers and the remote drivers and retain such recordings for at least one year.[11]

Carriers participating in the Deployment Program can provide services only to adults 18 years of age or older and may not provide passenger service operations at airports without their express authorization.

---

[11] Thus, contrary to Petitioners' assertion, the requirements to participate in the Deployment Program established by the Deployment Decision with respect to driverless AVs are not a "meager checklist."

14

During the comment period preceding issuance of the Deployment Decision, the Commission received comments from numerous stakeholders, including the San Francisco County Transportation Authority. The Authority and several other local governmental entities urged the Commission not to authorize the operation of AVs for hire and to, instead, focus its attention on "public safety." The Commission responded that, like the pilot program, the Deployment Program requires applicants to possess a DMV AV deployment permit, thus ensuring the applicant meets DMV "requirements related to [the] initial safety of the vehicle and automated driving system." The Commission also had obtained significant data from its pilot program and was of the opinion the technology was "at an inflection point where fared service [was] an appropriate next step to support AVs in passenger service and to expand the public's understanding of the service."

The government entities also urged the Commission to establish road safety standards, observing there are no federal standards in this area. The San Francisco County Transportation Authority suggested specifically that the Commission adopt a street safety goal stating, " 'AV Passenger Service should improve safety for all road users, ' " and it urged the creation of an expert safety committee to determine whether an applicant's AVs are safer than a typical human driver. The Commission responded this would require it to evaluate AVs' road driving capabilities, which the DMV is charged with assessing, making the DMV "the appropriate authority to evaluate and affirm through the permit process the AVs' capability to perform the dynamic driving task." As for the government entities' request for law enforcement input, the Commission responded such input also occurs through the DMV's deployment permitting process, pointing out the DMV requires applicants to submit a law enforcement interaction plan for driverless deployment.

15

With respect to the government entities' comments about passenger safety in the context of shared rides, the Commission responded that carriers participating in the Deployment Program must submit a passenger safety plan, which must be developed "as an integral part of their company's operations and business model" and will be subject to public review.  Carriers must also report the number and cause of complaints and incidents on a quarterly basis to enable the Commission "to understand the public safety and consumer protection impacts of the range of driverless operations including shared services."

Following the Commission's issuance of its Deployment Decision, the San Francisco County Transportation Authority and the San Francisco Municipal Transportation Agency  filed a request for rehearing.  The two transportation entities maintained the Commission should have first conducted an environmental review under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA) or, alternatively, should have adopted a limited first phase for its program, as allowed by the CEQA guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.).

The Commission denied rehearing but made some modifications to its decision.  It concluded the Deployment Decision caused no reasonably foreseeable environmental impacts, and thus did not constitute a project under CEQA and modified the decision to so state.  The Commission also decided to implement the Deployment Program through phases.  "Phase I" would permit the authorization of driverless AV service which would allow for additional data collection.  "Phase II" would be initiated no later than three years from the date of approval of the first deployment permit.  During this phase, the Commission would evaluate the data collected during Phase I and parties could raise the applicability of CEQA should they choose to do so.

No entity or person, including the San Francisco transportation entities, sought modification of the Deployment Decision by the Commission. (See Cal. Code Regs., tit. 20, rule 16.4, subd. (a) ["A petition for modification asks the Commission to make changes to an issued decision."].)[12] Nor did any entity or person, including the San Francisco transportation entities, seek judicial review of the Deployment Decision.

***The Commission's Approval of Waymo's Driverless AV Service***

**The Advice Letter**

In accordance with the Deployment Decision, Waymo submitted an advice letter in December 2022 seeking a Phase I driverless AV deployment permit. At the time, Waymo was participating in both the AV driverless pilot program and the Phase I drivered AV Deployment Program, and the DMV had amended Waymo's DMV AV deployment permit to allow driverless AV services for hire in San Francisco and a portion of Daly City (the applicable operational design domain).[13]

In its advice letter, Waymo recited it had begun AV research and development over a decade earlier, originally as the "Google Self-Driving Car Project." This work included 20 million autonomous miles on public roads, 20 billion miles of simulated driving, and tens of thousands of comprehensive tests.

---

[12] Allegations of new or changed facts in any such petition must be supported by an appropriate declaration or affidavit. (Cal. Code Regs., tit. 20, rule 16.4, subd. (b).) If more than one year has elapsed since the action to which modification is sought, the petition must also explain why the petition could not have been presented within one year of the effective date of the decision. (*Id.*, subd. (d).)

[13] Waymo was also operating in Arizona. It had commenced driverless service there in 2019 and completed tens of thousands of driverless trips.

Waymo also discussed its compliance with the requirements set forth in the Deployment Decision for issuance of a permit. It attached, for example, its passenger safety plan which explains how a passenger can easily identify the appropriate vehicle through a distinctive roof sensor that displays the passenger's initials (or other chosen letters) in assorted colors. Once the passenger unlocks the door using the Waymo mobile application, the vehicle displays a boarding icon and plays a welcome chime along with the passenger's name. There are cameras inside the vehicle along with an in-vehicle screen display from which the passenger can start the trip, call rider support, pull over, and/or lock the door. The screen also displays the passenger's estimated time of arrival and trip details. Rider support is available 24/7 and can be reached by phone, chat, e-mail, or through the AV's built-in, two-way communication system. Routine requests are typically answered in 60 seconds, with urgent needs prioritized for faster response. 911 can be called directly from the mobile app. Any collision or unexpected stop triggers immediate notice to Waymo's "Fleet Response" and "Rider Support" teams. If rider support observes or is notified of any harassing or threatening behavior during a ride, it will end the trip, allow the vehicle to pull over to a safe location, and call 911. Waymo additionally attached its law enforcement plan (required by the DMV) which provides information— starting with Waymo's toll-free hotline for emergency responders—regarding such things as how to identify Waymo AVs; the location in the AV of pertinent documents; how to approach, disable, and tow the vehicle; vehicle system overviews; and additional information in case of fire or submersion in water.

Finally, Waymo provided all necessary attestations regarding its compliance with DMV permitting and regulatory requirements and its 30

18

days of operation under the DMV's AV deployment permit amendment. It averred it would comply with all relevant reporting requirements.

In January 2023, the San Francisco transportation entities and the San Francisco Mayor's Office on Disability filed a protest to Waymo's advice letter. Although these government entities recognized "[m]any details described in the [a]dvice [l]etter reflect attention to city concerns about the safety and integrity of the transportation network and about providing equitable service that is accessible to people with disabilities," they maintained the "nearly unrestrained scope of service sought by Waymo [was] too much for its first foray into paid driverless service in San Francisco." They further asserted there had been "significant new operational challenges in interactions between AVs and other street users where AVs [had] interfered with traffic and transit operations," making blanket authorization for the deployment of driverless AVs unreasonable. According to the protesting entities, these challenges included driverless AVs obstructing travel lanes through unplanned stops and safety issues with respect to planned pickups and dropoffs in travel lanes. They acknowledged, however, the "large majority of the unplanned travel lane AV stops reported through December 2022 involved Cruise AVs rather than Waymo AVs."[14] They asserted that in light of these challenges the Commission's reporting requirements were inadequate. The entities also complained Waymo had not yet submitted quarterly reports with respect to its driverless AVs because the service was so new.

---

[14] In June 2022, the Commission had authorized Cruise, LLC to provide commercial passenger service with a limited fleet of driverless AVs between the hours of 10:00 p.m. and 6:00 a.m. outside San Francisco's downtown core.

The San Franciso transportation entities and the Mayor's Office urged that only limited deployment be allowed, outside the downtown core and peak travel hours, with incremental increases as readiness was demonstrated; that there be more transparency with respect to data available to the public; and that "driverless readiness data" be collected, including (1) the lanes affected and duration of all unplanned driverless AV stops and (2) the distance from the curb and duration of all pickups and dropoffs. They also took issue with use of the advice letter process because new issues had arisen not contemplated by the Deployment Decision. They maintained additional workshops and further rulemaking were necessary and urged the Commission, at the very least, to promptly schedule workshops and initiate a subsequent phase of the proceedings to address industry developments since the Deployment Decision.

**The Draft Resolution and Related Commission Proceedings**

On May 11, 2023, the Commission's Consumer Protection and Enforcement Division (Protection and Enforcement Division) circulated a draft resolution authorizing Waymo to participate in the driverless AV Deployment Program.

On May 25, the assigned commissioner issued a ruling, seeking comments and setting an all-party meeting pertaining to a proposal by the Protection and Enforcement Division for new AV data reporting requirements. In so doing, the commissioner stated, "The evolution of the AV industry has brought to light operational issues that demand a proactive and flexible regulatory approach that must continually evaluate and develop regulatory policy in order to ensure that AV service is safe, equitable, accessible to the widest range of potential riders, and meets the environmental goals of the AV program." The proposed new reporting

20

requirements included extensive information regarding any AV "minimal risk condition" (unplanned stop), including date, time, and location, involvement of first responders, resolution, response time, passenger information, and narrative explanation. They also required a count of passenger pickups and dropoffs occurring more than 18 inches from the curb by zip code, census track, and time of day.

The San Francisco transportation entities submitted comments on the proposed rulemaking, stating it was a "robust starting point," but urging broader data collection addressing public safety, environmental, equity, and accessibility goals.

The San Francisco transportation entities, along with the San Francisco Planning Department, also submitted comments on the draft resolution authorizing Waymo to participate in the driverless AV Deployment Program. They asserted that, since submission of the protest to Waymo's advice letter, incidents involving Waymo vehicles had increased significantly and had interfered with emergency response workers and other street-based workers. They maintained the draft resolution also ignored reports of moving and parking violations by Waymo AVs, referencing incidents reflecting failure to navigate emergency or construction lane closures and to respond appropriately to workers directing traffic in those situations.

The entities applauded the new data reporting rulemaking process, but maintained the Commission should take no action with respect to Waymo's advice letter until the Commission adopted expanded reporting requirements and set minimum performance standards. They further urged the Commission to develop a "factual" record assessing the benefits and risks of unlimited expansion of driverless AV service and to undertake environmental

review. They maintained that, at a minimum, any permit issued to Waymo should authorize only incremental deployment.

The San Francisco entities similarly asserted that even if Waymo's passenger safety plan was complete with respect to the requirements for *passenger* safety set forth in the Deployment Decision, it was unreasonable to authorize fared driverless deployment given the newly reported incidents and risks to *public* safety.

According to the entities, authorization also would be contrary to the Passenger Charter-party Carriers' Act's mandate that the Commission consider "public" safety. Although the commenters acknowledged the DMV's jurisdiction with respect to AV operational safety, they urged the Commission to craft and impose additional "public" safety rules in the context of any Waymo driverless AV deployment permit. Finally, they claimed there was no support for the draft resolution's conclusion that Waymo AVs had a " 'good safety record.' "

On June 29, 2023, the Commission issued draft resolution No. TL-19144, which, if issued in final form, would authorize issuance of a Phase I driverless AV deployment permit to Waymo. The Commission found Waymo met all requirements set forth in the Deployment Decision, including submitting a complete passenger safety plan that "reasonably addressed" its proposed driverless AV service.[15]

The Commission recounted it had received one timely protest, two timely responses providing comments and expressing concern, and 38 timely responses in support of Waymo's advice letter. The stakeholders expressing support included elected officials, local groups, accessibility advocates,

---

[15] Waymo did not request authorization for fare-splitting at this juncture.

22

business and economic development organizations, technology industry groups, and transportation advocates.

With respect to the January 2023 protest filed by the San Francisco transportation entities and the Mayor's Office on Disability, the Commission concluded it was not a "proper protest," as it was, in effect, an attempt to relitigate policy decisions made in the Deployment Decision, which was now final. The protest was also largely based on policy objections, which are not a basis for protest. The Commission therefore treated the entities' protest as a "response."[16]

As for the two other responses expressing concern, the Los Angeles Department of Transportation (Los Angeles DOT) expressed concerns similar to those expressed by San Francisco entities. The California Transit Association urged the Commission to limit the scale of Waymo's driverless operations, referencing " 'documented incidents where driverless AVs have blocked light rail vehicles and buses, [and] encroached upon transit only lanes, impacting hundreds of transit riders in San Francisco.' "

On August 7, 2023, the Commission held another all-party meeting, this one focusing on first responder concerns regarding driverless AVs, manufacturer plans for improving interactions with first responders, and

---

[16] Pursuant to Commission General Order No. 96-B, "protests" of advice letters are permitted in six delineated circumstances, such as when the entity involved failed to properly serve or give notice of the advice letter or when there are material errors or omissions in the analysis, calculations or data submitted. (Cal.P.U.C. Gen. Order No. 96-B, *supra*, gen. rule 7.4.2.(1) & (3), p. 13.) A protest may not, however, be based on policy objections where the relief requested in the advice letter follows rules already established by statute or Commission order. (*Id.*, gen. rule 7.4.2, p. 13.) All other timely submissions are "responses." (*Id.*, gen. rule 7.4.1, p. 12.) The author of the advice letter must reply to any protest but need not reply to a response. (*Id.*, gen. rule 7.4.3, p. 13.)

input on the passenger safety plans that had been submitted in connection with driverless operations.

The DMV submitted comments in advance of the meeting. After detailing its statutory mandate to regulate AV operations on California roadways and its experience in that regard, the DMV stated it was "uniquely qualified to address these issues" as "a recognized leader in regulating autonomous vehicles," and that it "meets regularly with other jurisdictions, the National Highway Traffic Safety Administration (NHTSA), and international delegations." The DMV also emphasized that it "meets regularly with manufacturers to review incidents occurring on public roads, understand the cause of incidents, and determine whether and how the company has addressed the cause and taken steps to prevent future occurrences." It further pointed out it has enacted numerous requirements to receive an AV testing or deployment permit, noting in particular that law enforcement interaction plans must be reviewed and updated at least annually. It emphasized it takes its regulatory role seriously, and since 2014, had issued three orders of revocation and eight orders of suspension to AV manufacturers.

Four of the five commissioners on the Commission made opening remarks at the meeting; Waymo spoke regarding the overall safety of its AVs and the issues of unplanned stops and interactions with first responders; representatives from the City and County San Francisco and the City of Los Angeles commented on their concerns; and participants discussed ongoing concerns and suggested improvements, such as amending state law to allow for issuance of moving violations to driverless AVs, allowing emergency responders to take over an AV if necessary, training of first responders, and

24

better AV recognition of safety cones.  Various other stakeholders also spoke, as did members of the public.

**The Final Resolution**

Four days after the all-party meeting focusing on driverless AV interactions with first responders and passenger safety plans, the Commission issued final resolution No. TL-19144, authorizing issuance of a Phase I driverless AV deployment permit to Waymo.  The final resolution tracked the draft resolution in concluding that Waymo met all the requirements of the Deployment Decision and had submitted a complete application for a permit.  The final resolution authorized Waymo to provide fared driverless AV service throughout its operational design domain at all hours.

The Commission observed that protecting passenger safety is both statutorily mandated and one of the four goals of the Phase I AV Deployment Program.  Thus, Waymo's passenger safety plan had played "a critical role in [its] evaluation of the safety implications of Waymo's proposed service."  The Commission found "[t]he technology, policies, and procedures Waymo describes are generally reasonable for its proposed service," and the company "demonstrated its commitment to passenger safety" through its passenger safety plan, which includes rapid response times to customer inquiries while trips are in progress, clear protocols for responding to a range of adverse events, and "model strategies" to protect passenger and public safety during pickups and dropoffs.  Further, incident reports submitted by Waymo at the federal level indicated its driverless vehicles in California had not been involved in any collisions resulting in injuries.

With respect to scale, the Commission explained the Deployment Decision "does not prescribe or contemplate a particular progression for

25

testing and deployment of AVs in terms of participation in Commission programs, number of vehicles, character of operations, or other factors." Rather, it requires an applicant to submit an operational design domain approved by the DMV "which has authority over the technical ability of the vehicle to operate safely on public roads in California." It thus rejected commenter requests for incrementalism, but "expect[ed] continued collaboration" between Waymo and stakeholders to promote thoughtful scaling and to minimize any negative impacts.

With respect to operational safety, the Commission observed "the safety of AV passengers and the safety of the broader public are both interdependent and mutually reinforcing—public safety is passenger safety and vice versa." It found "concerning" the operational issues raised by the San Francisco entities given the "wide range of potential impacts to passengers and the public." And it specifically referenced hazards caused by pickups and dropoffs more than 18 inches from the curb. Waymo's procedures for passenger pickup and dropoff, however, met the requirements of the Deployment Decision. And Waymo, specifically, had maintained a "good safety record," as available data showed that none of the incidents referenced by the San Francisco entities involving Waymo driverless AVs had resulted in bodily harm to passengers or the public. The Commission also observed the Deployment Decision did not establish specific criteria for operational performance; nor did it condition permit approval on meeting particular thresholds for past performance.

The Commission went on to emphasize the "many potential benefits of widespread AV deployment: enhancements to passenger and roadway safety, accessibility, economic development, and reduction in environmental impacts, among other benefits, as discussed by the many support letters submitted" in

response to the advice letter. It also recognized the need to balance the potential benefits against potential risks, and it remained "concerned about potential risks, known and unknown, to passenger and public safety as driverless AVs scale up." In particular, the Commission acknowledged the "continued and emerging challenges relating to passenger and public safety and data reporting raised by first responders, law enforcement, and local transportation agencies." It would therefore "engage with stakeholders on these issues through its rulemaking process" and "continue to increase engagement with the [DMV] and the law enforcement interaction plans required under state law." The Commission would also "continue to evolve regulatory policy to ensure passenger and public safety and support achievement of the AV program's safety, equity, accessibility, and environmental goals." And "[a]ny additional regulatory policy or requirements adopted through the rulemaking process will apply to any authorizations granted through [the final resolution] upon adoption by the Commission."

The Commission observed it had received 27 timely comments with respect to the resolution—23 in support of Waymo's application, one expressing conditional support, and three (from the City of Santa Monica, the Los Angeles DOT, and the San Francisco entities) expressing concern or opposition. The comment providing conditional support sought the incorporation of a specific technology into driverless AVs. The Commission rejected this suggestion, pointing out the DMV has primary authority over AV vehicle safety. Santa Monica repeated the safety concerns that had been raised in comments to Waymo's advice letter. It urged a phased approach to driverless AV deployment and increased data transparency. The Commission pointed out those concerns had been addressed both by the Deployment

27

Decision and in the final resolution as described above. The Los Angeles DOT suggested the Commission declare through its rulemaking that local jurisdictions have permitting authority over AVs to manage the operational issues that the Commission does not consider. The Commission stated it had already rejected this " 'sandbox' " approach to regulation in its Deployment Decision.

The San Francisco entities opposed the resolution on the basis of new reports of safety concerns. Specifically, they referenced 18 incidents observed by San Francisco fire personnel between April 2022 and May 2023. They maintained that in light of these incidents the record was inadequate and material issues needed to be resolved prior to approval of any driverless AV deployment. They further asserted Waymo's application should be deferred until data reporting issues had been resolved through the pending rulemaking process or, at the very least, approved with limitations on scale, time, and location of operations.

The Commission responded that while it appreciated the comments by the San Francisco entities, the information provided did not represent a "sufficiently robust set of facts" upon which to depart from the findings and procedures set forth in the Deployment Decision and to reject Waymo's application. (Only four of the 18 referenced incidents involved Waymo driverless vehicles.)[17] The Commission also pointed out it had already initiated the rulemaking process to update data collection requirements for

_____

[17] These involved Waymo AVs entering an area marked by caution tape where a downed tree was being cleared; stopping on a one-way road, which required a fire vehicle to back up and use another street; blocking a street due to a sleeping passenger, which required fire personnel response; and blocking a fire vehicle from backing into a fire station.

28

AVs so "rigorous, non-anecdotal incident and other AV operations data may be systematically collected, analyzed, and acted upon in the future."

The Commission also rejected the San Francisco entities' assertion the resolution's conclusion—that, based on National Highway Traffic Safety Administration (NHTSA) data, driverless Waymo AVs have not been involved in any collisions resulting in injuries in California—was unsupported. The Commission pointed out the entities referenced only four incidents and in all of them a safety driver had been present. Moreover, three of these incidents involved human-driven vehicles rear-ending the AVs, and, according to Waymo, the fourth involved insurance claims where there was no record of any contact with the Waymo AV. The two minor injuries reported were lower back pain suffered by the Waymo safety drivers. The Commission also disagreed with the entities' assertion that Waymo's AV collision rate appeared to be higher than that of average human drivers, noting it was based on a limited data set from six months of operations and an estimated 1.9 million vehicle miles traveled. The Commission pointed out that "[e]xtrapolating from less than 2 million miles to 100 million [(as the entities had done)] and then comparing [that extrapolation] to a national average without normalizing for factors such as roadway type (e.g. arterial vs. local street) or land use context (e.g., urban, suburban, or rural) introduces an unacceptably high degree of statistical error and uncertainty."

Following the Commission's adoption of the final resolution authorizing Waymo to provide driverless AV service for hire, the San Francisco transportation entities and the San Francisco Planning Department requested that the Commission stay its action. They maintained technical issues with respect to AVs were continuing to impact passenger and public safety as there had been 59 incidents of AV interference with firefighters

29

between April 2022 and August 2023. As we discuss, *post*, approximately 15 of these incidents related to Waymo driverless AVs and largely involved inappropriate stopping or blocking. They further asserted they were likely to succeed on the merits of claims that the Commission had legally erred or abused its discretion in authorizing Waymo's fared driverless deployment without further conditions tied to AV performance and without environmental review under CEQA.

The San Francisco entities subsequently filed a petition for rehearing. They maintained the Commission had erred in granting Waymo a Phase I driverless AV deployment permit without properly considering "public" safety impacts, and, since the Commission was obligated to ensure "public" safety in its regulation of commercial passenger service, rehearing was required so the Commission could "regulate appropriately in response to the substantial evidence before it about the passenger and public safety hazards arising from driverless AV operations that [had] been documented on San Francisco streets." The entities also claimed rehearing was necessary because authorizing the operation of a large number of driverless AVs might result in significant environmental impacts and the Commission had not complied with CEQA. They additionally asserted the Commission's advice letter process was an improper vehicle for reviewing a permit application, such as Waymo's, that was "highly controversial and raised significant policy questions." The entities maintained further factfinding and hearings were required to address public safety, Vehicle Code violations, and environmental impacts.

The Commission denied rehearing. It first observed the purpose of a rehearing application is to alert the Commission to legal error that can be

30

corrected expeditiously; it is not a means for reweighing evidence or to relitigate issues previously determined by the Commission.

With respect to the vehicle safety issue raised in the petition, the Commission explained it had, in its Deployment Decision, already considered how to regulate AV safety and had "adopted an approach that distinguished 'vehicle safety' and 'passenger safety.' " Specifically, "[t]he Commission noted that the DMV will only issue a permit to deploy AVs if, among other things, 'the manufacturer has conducted test and validation methods and [it] is satisfied, based on the results of the tests and validations, that the vehicles are safe for deployment on public roads in California.' The DMV also issues an Operational Design Domain ('ODD') to AV operators, containing limitations as to geography, roadway type, speed, weather conditions, daily hours of operation, and other matters. The Commission thus found the DMV is the appropriate authority to evaluate and affirm through the permit process the AV's capability to perform the dynamic driving task." (Fns. omitted.) The Commission, in turn, had adopted passenger safety as a goal and required the submission of a passenger safety plan that explains the applicant's policies and procedures "to minimize risk for all passengers in their driverless vehicles." Thus, the Commission explained, it had not failed to fulfill its statutory duty to protect public safety. Rather, it had determined in the face of overlapping regulatory mandates that "the DMV is the agency with the broadest authority and greatest technical expertise regarding vehicle and road safety matters and therefore has the primary responsibility for vehicle and road safety." Moreover, the Commission had considered the public safety issues raised during the Waymo permitting process and had properly relied on its consideration of these same issues in the Deployment

31

Decision process and on the safety and reporting requirements set forth therein.

With respect to the San Francisco entities' claim that the advice letter process was inappropriate, the Commission explained its rules support this process "where the advice letter process has been authorized or required by Commission order," as in the Deployment Decision.[18]

On the denial of rehearing, the Petitioners filed the instant writ proceeding.[19]

---

[18] The Commission made some modifications to its resolution with respect to CEQA's inapplicability. But CEQA is not an issue Petitioners have pursued in these proceedings.

[19] The County of San Mateo sought leave to appear as an amicus curia, stating it was concerned about the Commission proceedings at issue because the Commission had recently relied on them to approve Waymo's application to expand services into San Mateo at the staff level. In its response, the Commission stated that following the DMV's approval of an expanded operational design domain for Waymo driverless AVs to include portions of the Los Angeles area and the San Francisco Peninsula, including San Mateo, Waymo, pursuant to the Deployment Decision, applied to the Commission for expansion of its driverless AV deployment permit via a tier two advice letter. Although the Protection and Enforcement Division approved the application, it remains under administrative review as objections to the approval converted the matter into a proceeding which must be decided by resolution. Accordingly, the Commission's review of that application is not final and is generating a separate administrative record that is not relevant to disposition of the instant writ proceeding. Thus, while we granted leave to appear as an amicus, we do not discuss the San Mateo administrative proceeding further. In any case, since San Mateo's general legal arguments largely track those of Petitioners, our discussion encompasses those arguments.

## DISCUSSION

### *Review of Commission Decisions*

Section 1756, subdivision (a) authorizes "any aggrieved party" in this context to file a petition for a writ of review in the Court of Appeal. This court may summarily deny the petition for review if it is procedurally inadequate or lacks substantive merit. (*Leone v. Medical Board* (2000) 22 Cal.4th 660, 670; *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1193 [reviewing court is not " 'compelled to issue the writ if the [Commission] did not err' "].) Where, however, " 'writ review is the exclusive means of appellate review of a final order or judgment, an appellate court may not deny an apparently meritorious writ petition, timely presented in a formally and procedurally sufficient manner, merely because, for example, the petition presents no important issue of law or because the court considers the case less worthy of its attention than other matters.' " (*PG&E Corp. v. Public Utilities Com.*, at p. 1193.)

In conducting our review, we must take into account that the Commission "is not an ordinary administrative agency, but a constitutional body with broad legislative and judicial powers." (*Wise*, *supra*, 77 Cal.App.4th at p. 300.) For this reason, "its decisions are presumed valid. [Citation.] . . . The presumption of correctness of the [Commission]'s findings has consistently been described by our Supreme Court as a 'strong' presumption." (*The Ponderosa Telephone Co. v. Public Utilities Com.* (2019) 36 Cal.App.5th 999, 1012–1013; *Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529, 537 ["There is a strong presumption favoring the validity of a Commission decision."].)

Accordingly, the scope of our review is "limited." (*City and County of San Francisco v. Public Utilities Com.* (1985) 39 Cal.3d 523, 530.) Judicial

33

review "shall not extend further than to determine, on the basis of the entire record . . . whether" the Commission "acted without, or in excess of, its powers or jurisdiction"; failed to proceed "in the manner required by law"; rendered a decision unsupported by the findings; made findings unsupported by substantial evidence; rendered a decision that "was procured by fraud or was an abuse of discretion"; or issued an order or decision that violates the petitioner's state or federal constitutional rights. (§ 1757, subd. (a)(1)–(6).)

"We do not conduct a trial de novo, nor weigh nor exercise independent judgment on the evidence. [Citations.] The Commission's findings of fact ' "are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence." ' " (*Southern California Gas Co. v. Public Utilities Com.* (2023) 87 Cal.App.5th 324, 339 (*Southern California Gas*).) In determining whether the Commission abused its discretion, we consider whether it "adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choices made, and the purposes of the enabling statute." (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212; see *Securus Technologies, LLC v. Public Utilities Com.* (2023) 88 Cal.App.5th 787, 803 (*Securus*).) Put another way, Commission decisions are subject to reversal only if "no reasonable person could reach the conclusions it did." (*The Utility Reform Network v. Public Utilities Com.* (2014) 223 Cal.App.4th 945, 959.)

In all cases, a petitioner challenging a Commission decision bears the burden of establishing the grounds for setting aside the decision and that any error was prejudicial. (*Securus*, *supra*, 88 Cal.App.5th at p. 798; *Southern*

*California Edison Co. v. Public Utilities Com.* (2014) 227 Cal.App.4th 172, 185.)[20]

### *Consideration of Public Safety*

Petitioners continue to press the argument that the Commission ignored public safety in approving Waymo's Phase I driverless AV deployment permit, in contravention of the Passenger Charter-party Carriers' Act's mandate "to promote carrier and public safety through its safety enforcement regulations." (§ 5352, subd. (a).) Specifically, Petitioners complain that, in regulating driverless AVs, the Commission has focused only on *passenger* safety and erroneously disregarded *public* safety.

As we have recited, the stated purposes of the Passenger Charter-party Carriers' Act are numerous: "[T]o preserve for the public full benefit and use of public highways consistent with the needs of commerce without unnecessary congestion or wear and tear upon the highways; to secure to the people adequate and dependable transportation by carriers operating upon the highways; to secure full and unrestricted flow of traffic by motor carriers over the highways which will adequately meet reasonable public demands by providing for the regulation of all transportation agencies with respect to accident indemnity so that adequate and dependable service by all necessary transportation agencies shall be maintained and the full use of the highways

---

[20] In support of its arguments here, Petitioners filed a concurrent request for judicial notice. We grant the request with respect to exhibits D, E, F, and H through K. (Evid. Code, § 452, subds. (b) & (c).) We deny the request with respect to exhibits A through C and G on relevance grounds. At oral argument, Petitioners acknowledged that certain of these exhibits were no longer relevant given the trajectory of the litigation. To the extent we cite to Commission rules or other information not reasonably subject to dispute that was not part of the record of proceedings, we take judicial notice on our own motion. (Evid. Code, § 459, subd. (a).)

preserved to the public"; as well as "to promote carrier and public safety through its safety enforcement regulations."  (§ 5352, subd. (a).)

The Act further specifies that "[t]o achieve [its] purposes," the Commission "shall" do things such as dedicating staff to answer inquiries from carriers, prioritizing the timely processing of consumer complaints, and implementing "a process for appropriate and timely enforcement against illegally operating carriers, including by performing staff-driven investigations and performing enforcement through sting operations and other forms of presence in the field."  (§ 5352, subd. (b)(3), (4) & (6).)

There is no question the Commission has broad authority to enact regulations that enhance public safety.  (See § 5381 ["the [C]ommission may supervise and regulate every [passenger carrier] in the State and may do all things . . . necessary and convenient in the exercise of such power and jurisdiction"].)  Petitioners point, for example, to Commission requirements that ride hail services like Uber and Lyft conduct background checks on all drivers, impose "zero-tolerance" policies for drivers under the influence of drugs or alcohol, and require driver training.  (See Cal.P.U.C. Gen. Order No. 157-E, pt. 11, §§ 11.03, 11.04, 11.07.)  However, either label—public safety or passenger safety—can be affixed such requirements.  There is, in short, as the Commission recognized, a clear overlap between regulatory provisions aimed at protecting the "public" and those aimed at protecting "passengers."

In its Deployment Decision, the Commission concluded, as a matter of policy, it would focus on passenger safety in the AV context since the DMV has been statutorily charged with the regulation of the road worthiness and road safety of AVs and has duly taken up its statutory responsibility.  As stated above, no stakeholder participating in the Deployment Decision

36

proceedings, including the San Francisco entities, mounted a judicial challenge to that decision.  Accordingly, the Deployment Decision is final and conclusive as to the legal validity of the Commission's policy determinations therein.  (See § 1709 ["In all collateral actions or proceedings, the orders and decisions of the commission which have become final shall be conclusive."]; *Anchor Lighting v. Southern California Edison Co.* (2006) 142 Cal.App.4th 541, 549 ["That the policy [the Commission] adopted and enforced might have been incorrect or inconsistent with the Legislature's fiat is presently irrelevant because those claims had to be timely raised by a petition for review"].)

It is true the Commission "may at any time, upon notice to the parties, and with opportunity to be heard as provided in the case of complaints, rescind, alter, or amend any order or decision made by it."  (§ 1708.)  But the Commission has not taken any such action.  Nor have Petitioners ever filed a petition asking the Commission to do so.  (See Cal. Code Regs., tit. 20, §16.4, subd. (a) ["A petition for modification asks the Commission to make changes to an issued decision."].)

It is also true the Commission stated in its final resolution authorizing Waymo to provide driverless AV service for hire that "[i]t is reasonable for AV regulation and policy at the Commission to evolve as AV technology and operations scale and change."  The Commission similarly acknowledged during the proceedings that the "continued and emerging challenges relating to passenger and public safety and data reporting raised by first responders, law enforcement, and local transportation agencies" and stated it will continue to engage in the rulemaking process to review and refine its regulatory policies, which will apply to any authorizations issued pursuant to its Deployment Decision.  Thus, the Commission has chosen to address

evolving issues through the correlative rulemaking process that is underway, the requirements of which will be incorporated into Waymo's permit.

Petitioners' fundamental complaint, then, is that the Commission should have deferred any action pursuant to its Deployment Decision until it completed another round of the rulemaking process and this process must focus on all aspects of AV safety. Thus framed, the crux of the issue before us is whether the Commission failed to proceed in a manner required by law or abused its discretion by choosing not to revisit policy determinations made in its Deployment Decision prior to taking any action pursuant to that decision and, specifically, prior to authorizing Waymo to provide driverless AV service for hire.

As we have recited, the Passenger Charter-party Carriers' Act has multiple purposes. (§ 5352, subd. (a).) The Act further specifies that "[t]o achieve [its] purposes," the Commission "shall" do things such as dedicating staff to answer inquiries from carriers, prioritizing the timely processing of consumer complaints, and implementing "a process for appropriate and timely enforcement against illegally operating carriers, including by performing staff-driven investigations and performing enforcement through sting operations and other forms of presence in the field." (§ 5352, subd. (b)(3), (4) & (6).) Notably, however, the Act does not require the Commission to adopt any specific set of regulations, let alone specific safety regulations. To the contrary, the only statutory mandates involve the actions set forth above, such as dedicating staff to answer inquiries from carriers and adopting investigation and enforcement procedures to locate and take action against passenger carriers operating illegally. (§ 5352, subd. (b).)

Accordingly, it cannot be said that the Commission, in proceeding in accordance with its Deployment Decision, and choosing not to defer any

38

action thereunder until the conclusion of additional rulemaking procedures focusing on AV "public" safety, failed to proceed in the manner required by law. (See *Utility Consumers' Action Network v. Public Utilities Com.* (2010) 187 Cal.App.4th 688, 698 [petitioner cited "no statutory or case authority" requiring Commission to use higher standard of proof; "[a]ccordingly, the presumption of validity provide[d] sufficient grounds to reject [the petitioner's] arguments"].)

Nor can it be said that the Commission abused its discretion in choosing to abide by its determination in the Deployment Decision to focus on passenger safety given the Legislature's decision to commit to the DMV responsibility for ensuring the operational safety of AVs on California roadways. (Veh. Code, § 38750.) While the Commission also has authority to regulate AV safety, its mandate is more limited, applying solely to AVs for hire. Thus, the enabling statutes clearly give primary responsibility for AV operational safety to the DMV. The DMV, in turn, has expressly taken ownership of this responsibility, enacting a host of requirements aimed at protecting public safety, which it has been vigilant in enforcing. In so doing, the DMV has amassed a depth of knowledge and data on AV operational safety that far eclipses that of the Commission. As the DMV stated in its comments submitted prior to the all-party meeting focusing on first responder concerns, it is "a recognized leader in regulating autonomous vehicles," and is thus "uniquely qualified to address these issues."

Accordingly, the Commission's decision to abide by the policy choice it made in its Deployment Decision—to focus its attention on passenger safety AV issues, given the DMV's primary responsibility to ensure the operational and road safety of AVs—is a reasonable one and certainly not an abuse of discretion. (See *The Utility Reform Network v. Public Utilities Com.*, *supra*,

39

223 Cal.App.4th at p. 959 [Commission decisions are not subject to reversal for abuse of discretion unless "no reasonable person could reach the conclusion it did"]; see also *Securus*, *supra*, 88 Cal.App.5th at p. 803 [in reviewing for abuse of discretion, court may not substitute its judgment for that of the Commission].)  The Commission adequately considered the relevant factors and has demonstrated a rational connection between those factors, the choices made, and the purposes of the enabling statutory schemes pertaining to AVs, including the Passenger Charter-party Carriers' Act.[21] (See *Securus*, at p. 803.)  While a reasonable person might have reached a different conclusion than that reached by the Commission, that is not the standard by which a decision of the Commission, or any other government body, is adjudged for abuse of discretion.  (See *The Utility Reform Network*, at p. 959.)

### *Use of the Advice Letter Process*

Petitioners also continue to press the argument that the Commission failed to act in the manner required by law or abused its discretion in utilizing the advice letter procedure to consider Waymo's request for a Phase I driverless AV deployment permit.  They maintain Waymo's request "was highly controversial and raised significant policy questions" and therefore, under the Commission's own rules, it was inappropriate for review and approval via Waymo's advice letter.[22]

---

[21] As our detailed recitation of the factual background shows, the Commission did not, contrary to what Petitioners repeatedly claim, ignore new AV incidents raising "public" safety issues.  The Commission acknowledged the comments by the San Francisco entities in this regard and then explained why it did not find the incidents involving Waymo AVs supported departure from the process set forth in its Deployment Decision.

[22] Petitioners do not contend the Commission violated any statutory procedural requirement.

40

Petitioners face an uphill battle in contradicting the Commission's choice of procedure appropriate for a particular ruling or decision. As we have stated, the Commission is a constitutionally established, independent regulatory agency (see *Wise, supra*, 77 Cal.App.4th at p. 300), and "[s]ubject to statute and due process," it may establish its own procedures (Cal. Const., art. XII, § 2). Moreover, "[w]hether a utility may proceed by an advice letter or instead must file a formal application . . . is a decision peculiarly within the [Commission]'s expertise and judgment [citation], not this court's. We will not disturb the [Commission]'s selection between the procedures absent a manifest abuse of discretion or an unreasonable interpretation of the statutes governing its procedures [citation]." (*Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 282–283.) It is true General Order No. 96-B's general rule 5.1 states, "The advice letter process provides a quick and simplified review of the type of utility requests that are expected neither to be controversial nor raise important policy questions." (Cal.P.U.C. Gen. Order No. 96-B, *supra*, gen. rule 5.1, p. 8.) The process does not provide for an evidentiary hearing as "a matter that requires an evidentiary hearing may be considered only in a formal proceeding." (*Ibid.*) The advice letter process may be used where, among other things, such review "has been authorized or required . . . by . . . Commission order." (*Id.*, subd. (1), p. 8.)

The Deployment Decision specifically directs passenger carriers seeking a driverless AV permit to use this procedure. Accordingly, the Commission did not violate its own rules in choosing the advice letter process.

Moreover, the Commission considered many of the San Francisco entities' objections to issuance of a permit for driverless AV service for hire to be attempts to relitigate the issues it had considered and weighed, and the policy choices it had made, in its Deployment Decision. Thus, while

41

Petitioners may characterize the proceedings now at issue as "highly controversial" and raising "significant policy questions," the Commission not unreasonably treated its Deployment Decision as addressing this controversy and resolving these policy questions, such that, at this juncture, the Commission's focus is on whether permit applicants have adhered to the procedures and met the requirements established by that decision. While the Commission could have decided to expand this matter by granting rehearing and directing that Waymo's request for a Phase I driverless AV permit be reconsidered in a formal proceeding, as it has done with respect to advice letters pertaining to entirely different contexts, it certainly was not required by its own regulations to do so. Nor was its refusal to grant rehearing and thereby direct reexamination of Waymo's request in a formal hearing a manifest abuse of the Commission's discretion. (Compare, e.g., *Application of Rehearing of Resolution E-4792 filed by Southern California Edison Co.* (2016) Cal.P.U.C. Dec. No. 17-05-034 [granting a limited rehearing to determine in a formal proceeding the meaning of the phrase " 'in each metered interval' " used in a prior decision where how the calculation should be made was "not a straightforward matter"]; *Application for Rehearing of Energy Division Resolution E-4243* (2010) Cal.P.U.C. Dec. No. 11-11-019 [granting rehearing and allowing for a formal proceeding where the informal advice letter process the Commission set up was poorly structured, allowing it to rely on record information that was not available to all parties].)

***Substantial Evidence Supporting Resolution***

**Good Safety Record**

Petitioners mount two substantial evidence challenges to the Commission's final resolution, the first being that the Commission's conclusion that Waymo driverless AVs had a "good safety record" was not

supported by substantial evidence because the Commission assertedly ignored evidence of public safety risks associated with driverless AVs. In considering Petitioners' substantial evidence challenges we must bear in mind that "[t]he Commission's findings of fact ' "are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence." ' " (*Southern California Gas*, *supra*, 87 Cal.App.5th at p. 339; see *The Ponderosa Telephone Co. v. Public Utilities Com.*, *supra*, 36 Cal.App.5th at p. 1019 ["party challenging a [Commission] finding for lack of substantial evidence must demonstrate that, based on the evidence before the [Commission], a reasonable person could not reach the same conclusion"].)

As we have recited, the Commission relied on data from the NHTSA showing that Waymo *driverless* AVs had not been involved in any collisions resulting in injuries in California in stating "[a]vailable data show[s] Waymo has maintained a good safety record." The incidents Petitioners cite to refute this statement involved four Waymo *drivered* AVs and, as we have discussed, only two of those incidents resulted in minor injuries to the Waymo drivers. Thus, Petitioners have not carried their burden of demonstrating the Commission's conclusion as to Waymo's driverless AVs was unsupported by the record.

Nor did any other information presented by San Francisco entities during the Commission proceedings compel the Commission to reach a different conclusion. As we have recited, in comments to the draft resolution, the San Francisco entities referenced 18 incidents of driverless AV interference with fire personnel between April 2022 and May 2023. Four involved Waymo driverless AVs. These four involved an AV (1) entering an area marked by caution tape where a downed tree was being cleared; (2) stopping on a one-way road, which required a fire vehicle to back up and

43

use another street; (3) blocking a street due to a sleeping passenger, which required fire personnel response; and (4) blocking a fire vehicle from backing into a fire station. None resulted in injury. The Commission found this information did not establish "a sufficiently robust set of facts" to support either a deferral or denial of Waymo's Phase I driverless AV deployment permit, and it pointed out it had initiated rulemaking to update data collection requirements so "rigorous, non-anecdotal incident and other AV operations data may be systematically collected, analyzed, and acted upon in the future."

In sum, given the small number of incidents involving driverless Waymo AVs, the relatively minor nature of the incidents, and that none resulted in injury—in other words, considering the incidents *in context*—the Commission's statement that Waymo driverless AVs had a "good safety record" was sufficiently supported by the record.[23] (See *SFPP, L.P. v. Public Utilities Com.* (2013) 217 Cal.App.4th 784, 794, quoting *Eden Hospital Dist. v. Belshé* (1998) 65 Cal.App.4th 908, 915 [" ' "[i]t is for the agency to weigh the preponderance of conflicting evidence [citation]. Courts may reverse an agency's decision only if, based on the evidence before the agency, a reasonable person could not reach the conclusion reached by the agency." ' "].)

After the Commission issued its final resolution authorizing issuance of a Phase I driverless AV deployment permit to Waymo, but before the Commission denied the San Francisco entities' application for rehearing, the entities filed a motion to stay the resolution with the Commission. Therein, the entities referenced 59 incidents of driverless AVs interfering with

---

[23] That one of the five commissioners felt otherwise does not alter the fact sufficient evidence supported the view of the majority of the commissioners.

44

firefighters between April 2022 and August 2023, approximately 15 of which involved Waymo AVs.

The Commission maintains any supposedly new evidence referenced in a stay request is outside the administrative record on which a decision is based and therefore is not properly considered on judicial review of the decision. It also claims Petitioners failed to exhaust their administrative remedies in this regard.

However, we need not address the merits of the Commission's claims. Even assuming for sake of argument that new factual assertions made in a stay request can properly be considered part of the administrative record, and further assuming there is no exhaustion bar, the information proffered by the San Francisco entities, again considered *in context*, does not demonstrate the Commission's "good safety record" conclusion lacked any substantial evidence. Of the 59 referenced incidents, 15 involved Waymo AVs and four of these were the incidents referenced by the entities in their comments on the draft resolution. The other 11 incidents involved inappropriate stopping or blocking. None involved reported injuries. While reasonable minds arguably might debate the significance of 15 minor incidents, they do not compel the conclusion that no substantial evidence supported the Commission's assessment that Waymo AVs had a "good safety record."

Finally, the extrapolated number the San Francisco entities put before the Commission purporting to show Waymo AVs have a worse safety record than ordinary drivered vehicles does not rebut the Commission's "good safety record" conclusion. As the Commission observed, the entities' number appeared to be based on a limited data set and "[e]xtrapolating from less than 2 million miles to 100 million [(as the commenters had done)] and then

45

comparing [that extrapolation] to a national average without normalizing for factors such as roadway type (e.g. arterial vs. local street) or land use context (e.g., urban, suburban, or rural) introduces an unacceptably high degree of statistical error and uncertainty." (See *Securus*, *supra*, 88 Cal.App.5th at p. 803 [court may not reweigh the evidence or substitute its judgment for that of the agency]; *id.* at p. 807 [weight of evidence is matter for Commission].)

In sum, there is no merit to Petitioners' substantial evidence challenge to the Commission's determination that Waymo driverless AVs had a "good safety record."

**Vehicle Code Violations**

Petitioners also claim no substantial evidence supports the Commission's conclusion that Waymo met all the requirements of the Deployment Decision. Specifically, Petitioners assert the San Francisco entities submitted evidence of Vehicle Code violations by Waymo driverless AVs, and, since passenger carrier permit holders are required to comply with the Vehicle Code, the Commission's conclusion that Waymo has complied with all the terms and conditions of its passenger carrier permit is not supported by any substantial evidence.

The San Francisco entities advanced this assertion in their application for rehearing, and the Commission rejected it, explaining its regulations implementing the Passenger Charter-party Carriers' Act do not require suspension or revocation of a carrier permit based on isolated violations such as those referenced by the entities. Rather, the Commission will deny or revoke a passenger carrier permit for "repeated or egregious violations."[24]

---

[24] An example is the suspension of Cruise's permits after an incident in October 2023, when a pedestrian fell after being struck in a crosswalk by another vehicle and was then dragged under the wheels of a Cruise AV. No

The Commission's interpretation of its own regulations, of course, is entitled to great deference.  (See *Clean Energy Fuels Corp. v. Public Utilities Com.* (2014) 227 Cal.App.4th 641, 649.)

There is also no dispute that Waymo complied with all the other requirements set forth in the Deployment Decision for a Phase I driverless AV deployment permit.  Accordingly, there is no merit to Petitioners' claim that no substantial evidence supported the Commission's determination that Waymo met the requirements for such a permit.

## III.  DISPOSITION

Having granted Petitioners' petition for a writ of review, we reject their challenges to resolution No. TL-19144 on the merits and deny the relief requested.


BANKE, J.


WE CONCUR:


HUMES, P. J.


LANGHORNE WILSON, J.

---

referenced incident or violation of the Vehicle Code in this record is remotely comparable.

Counsel:

David Chiu, City Attorney, Yvonne R. Meré, Chief Deputy City Attorney, Sara J. Eisenberg, Chief of Complex and Affirmative Litigation, Andrea Ruiz-Esquide, Brian F. Crossman and Molly J. Alarcon, Deputy City Attorneys for Petitioners City and County of San Francisco and the San Francisco County Transportation Authority.

John D. Nibbelin, County Counsel and Caiti T. Busch, Deputy County Counsel for County of San Mateo as Amicus Curiae on behalf of Petitioners.

Christine Hammond, Aaron Bloom, Jonathan Reiger, Carrie Pratt and Enrique Gallardo for Respondent Public Utilities Commission.

Morgan, Lewis & Bockius LLP, F. Jackson Stoddard and Joseph Bias; Mari Reed Lane for Real Party in Interest Waymo, LLC.